STINNETT et al. v. PARAMOUNT–FAMOUS LASKY CORPORATION OF NEW YORK et al.

No. 1367—5519.

Commission of Appeals of Texas, Section A.

April 1, 1931.

146

Moroney & Moroney and W. M. Taylor, all of Dallas, for plaintiffs in error.

Cravath, deGersdorff, Swaine & Wood, of New York City, and Phillips & Phillips, M. W. Townsend, and Tom Scurry, all of Dallas, for defendants in error.

SHARP, J.

For a partial statement of the nature and result of this case, we adopt the admirable statement made by Chief Justice Gallagher in the opinion of the Court of Civil Appeals, 17 S.W.(2d) 125, which is as follows:

"This suit was instituted by appellees, R. J. Stinnett and S. Charninsky, against appellants, Paramount Famous Lasky Corporation and six subsidiary corporations, to recover $150,000 actual and $300,000 exemplary damages for the alleged 'wanton, malicious, deliberate and unlawful destruction of plaintiffs' business, in violation of the laws against trusts and conspiracies in restraint of trade,' etc. They further alleged that they were forced to sell out and retire from the ownership of the Capitol Theater (in Dallas) and to retire as operators from the class A theater business, and that their business and livelihood as operators of such theaters had been wrongfully and illegally destroyed by appellants.

"Appellees, on September 30, 1923, owned the lease on a building in Dallas known as the Capitol Theater, which had theretofore been run as a second class moving picture house. They then organized the Capitol Amusement Company, a corporation, with $10,000 capital stock. Appellees each subscribed and paid for $3,000 of said stock, and H. Charninsky subscribed and paid for $500 thereof. The remainder thereof was sold to other parties. The annual rental on said lease was $30,000. Appellees, or one of them, had prior to the organization of said corporation deposited with the landlord the first month's rent. Immediately on perfecting such organization said deposit was replaced with money of the corporation and the original deposit returned. Thereafter the corporation paid the rental on said lease. Appellees Stinnett was president, H. Charninsky vice president, and appellee S. Charninsky secretary and treasurer of said corporation. Within a few months after the organization thereof, appellees Stinnett and S. Charninsky acquired all the capital stock of said corporation except one share, which was retained by H. Charninsky. Said corporation immediately upon its organization began the operation of said Capitol Theater as a class A moving picture show. Subsequently it bought and paid for the fixtures and equipment used therein and made necessary improvements on the building. Appellees together acted as managers of said theater. Each drew from the earnings thereof an annual salary of $10,800. H. Charninsky was also employed by said corporation and paid an annual salary of $5,200. After the payment of said salaries and other expenses, the remaining earnings of said corporation were distributed among the stockholders thereof as dividends. Appellees state in their testimony that they operated said theater 'through' said corporation, and that they always treated the proposition as a partnership between them.

"Appellees from the first experienced some difficulty in securing high class films for exhibition in said theater. Some pictures were secured by them from Harold B. Franklin, alleged to have been agent and manager in the distribution of films for all the defendants, and some from other sources. In January, 1925, Franklin agreed with Charninsky to release to him for exhibition in said theater one-half of the pictures produced by First National and available for exhibition during the coming season of 1925–26. Shortly thereafter friction developed between said Franklin and appellees, and according to the testimony of Charninsky, Franklin attempted to evade compliance with said contract by refusing to meet him for the purpose of making selection of the pictures they were to have for exhibition, respectively. Finally, however, by subterfuge, Charninsky secured a meeting and the pictures available were apportioned according to said agreement. The increasing friction culminated a day or two later in a final interview between Charninsky and Franklin, in which Franklin became greatly excited and cursed and indicated a purpose to assault him. The conclusion of said interview was a declaration by Franklin that he would not renew said contract and would see that Charninsky did not get a decent picture to operate said theater. Appellees became alarmed at said threat, and notwithstanding they had under contract sufficient pictures to run said theater until the fall of 1926, they decided that they would sell the same. On November 7, 1925, they did sell the same to Universal Pictures Corporation for a net profit on their investment of $29,700. Said sale was effected by appellees transferring the lease, which remained in their name, to said corporation, and by also transferring to it their entire capital stock in said Capitol Amusement Company. H. Charninsky also transferred to it the share of stock held by him. Appellee Charninsky was thereupon employed by said corporation as manager to operate said theater, and continued as such until said corporation leased the theater to another company."

The case was submitted to the jury upon special issues, and they found that plaintiffs were entitled to actual damages sustained by them in the past in the sum of $60,000, and that the damages which they would sustain in the future amounted to $90,000, and they awarded plaintiffs the further sum of $187,500 as exemplary damages. The trial court, upon motion, required plaintiffs to remit certain amounts, and the judgment finally entered in favor of plaintiffs and against defendants amounted to the sum of $318,770, from which judgment the defendants appealed to the Court of Civil Appeals, and the judgment of the trial court was reversed. 17 S.W.(2d) 125.

At the conclusion of the testimony introduced by plaintiffs, the defendants and each of them requested the trial court to instruct the jury to return a verdict for each of the defendants. The trial court refused this instruction, and submitted the case to the jury upon special issues. Among others, the following special issues were submitted:

"Issue No. 3. In carrying out such agreement, if any, and in exercising such control, if any, did the defendants exclude or prevent the plaintiffs from procuring, by contract or otherwise, in advance, and in accordance with the custom, if any, in vogue among picture show operators, high-class films suitable and sufficient in number, for profitable use in the Capitol Theatre in Dallas, as then operated and intended to be operated in the future by plaintiffs, (if they did so intend) for exhibition in said theatre during the seasons of 1926 and 1927? Answer 'Yes' or 'No.'

"To which the Jury answered 'Yes.'

"Issue No. 4. In pursuance of said agreement hereinbefore inquired about, and in carrying out the same, if any such agreement there was, did the defendants threaten the plaintiffs in substance and to the effect that the defendants would see to it that the plaintiffs got no more good pictures for their picture show business? Answer 'Yes' or 'No.'

"If you have answered Issues Nos. 3 and 4 in the affirmative, then answer—

"Issue No. 5. At the time said threat, or threats, if any was made, was it the intention of the defendants to carry out such threats, if such were made, and could and would the defendants have prevented the plaintiffs from procuring the class of pictures they desired to get in sufficient numbers necessary to operate said Capitol Theatre profitably in the future? Answer 'Yes' or 'No.'

"If you have answered Issue No. 5 in the affirmative, then answer—

"Issue No. 6. At the time the plaintiffs sold out the Capitol Theatre in Dallas, then by reason of the said agreement and control of high-class films by defendants, if such there was, or by reason of said threat or threats, if such were made, or by reason of such agreement, control, and threat or threats, if any, did the plaintiffs have reasonable grounds to fear and did they fear that they would be unable to procure high-class films in the future and would not be able to operate the Capitol Theatre as a profitable business after exhausting the films then on hand or under contract, and were they thereby caused to sell out said Capitol Theatre and cease to operate the same? Answer 'Yes' or 'No.'

"In this connection, I instruct you that in determining your answers to the foregoing issues you may look to all the facts and circumstances in evidence in this case; and, further, that if in response to Issue No. 1, and that in response to subsequent issues you have found that the defendants were attempting to carry out said agreement during the time in

question, then during such time the acts or statements, if any, of any one of the defendants, through its authorized agent or officer, or agents or officers, in carrying out such agreement, and in furtherance thereof, would be binding on all, and in law would be deemed to have been said or done by them all.

"To which the Jury answered as follows:

"To Issue No. 4, we answer 'Yes.'

"To Issue No. 5, we answer 'Yes.'

"To Issue No. 6, we answer 'Yes.'"

◼ Objections were made by the defendants to the action of the trial court in giving special issues Nos. 5 and 6, above described, because, among other reasons, they were multifarious and duplicitous and embrace two separate and distinct questions of fact for the jury to pass upon.

The plaintiffs testified that they became alarmed at the threats made by Franklin that he would not renew the contract that had already been made between plaintiffs and one of the defendants, and, notwithstanding they had under contract sufficient pictures to run said theater until the fall of 1926, they decided that they would sell the same. On November 7, 1925, they did sell the same to the Universal Pictures Corporation for the sum of $75,000, and, after deducting various amounts in the way of expenses and other items, they received a net profit on their investment of $29,700; that the sale was effected by plaintiffs transferring to the corporation all the stock that they, as well as H. Charninsky, owned in the Capitol Amusement Company, and that everything they owned in the Capitol Amusement Company was transferred to the new corporation, and that thereafter S. Charninsky was employed by said new corporation as manager to operate said theater and continued as such until said corporation leased the theater to another company.

We are of the opinion that the special issues above described are subject to the objections urged. These issues, in the form submitted, violate article 2189, R. S. 1925, in that they combine two separate and distinct questions of fact, one of which might be answered by the jury "No" and the other "Yes" or vice versa. We sustain these assignments. Article 2189, R. S. 1925; Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517; Lumberman's Reciprocal Ass'n v. Wilmoth et al. (Tex. Com. App.) 12 S.W.(2d) 972.

Article 2189, Revised Civil Statutes, among other things, provides: "Such special issues shall be submitted distinctly and separately. Each issue shall be answered by the jury separately. In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues."

In the case of Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517, 521, the Supreme Court, in an opinion by Judge Greenwood says: "The statutes make it the duty of the court in trials by jury: First, to submit all the controverted fact issues made by the pleadings; second, to submit each issue distinctly and separately, avoiding all intermingling; and, third, to give such explanation and definition of legal terms as shall be necessary to enable the jury to answer each issue."

◼ The defendants further contend that the trial court erred in permitting the witness Charninsky to testify over their objections to the profits made by the Capitol Amusement Company during the time preceding the sale thereof, because such testimony was a conclusion of fact and of law, and was secondary evidence; the books of the company constituting the best evidence.

While Simon Charninsky was testifying as a witness for the plaintiffs on direct examination by plaintiffs' attorney, and after the witness had testified that he was part owner of the Capitol Amusement Company and that he sold the Capitol Theater in November, 1925, because of threats made by H. B. Franklin not to let the plaintiffs have any more pictures, in answer to numerous questions by his attorneys he was permitted to testify to the weekly, monthly, and annual earnings of both himself and Stinnett, and it developed in the examination of the witness that his figures about which he was testifying were taken from a report made for plaintiffs by H. E. Gordon & Co., accountants, at his request, which report was compiled from the books of the Capitol Amusement Company, covering a period from September, 1923, to November, 1925.

Defendants objected to the testimony because plaintiffs had been requested to produce the books of the Capitol Amusement Company, which would be the best evidence, and that a round statement as to what his profits were would be a conclusion of fact and of law. The trial court overruled the objection and permitted the witness to testify that they made in one year $43,000; that at the time they sold out they were making from $700 to $1,200 per week.

Neither the books nor the statement of Gordon & Co. were offered in evidence by either plaintiffs or defendants, and it was not shown who kept the books and whether they were correctly kept or that the statement made by Gordon & Co. was a correct and accurate statement made up from the books, and it is not shown that the witness Charninsky was in any way connected with the entries, or any of them, that were made in the books, or that he was testifying independently of his own knowledge from the matters contained in the books, from which the auditor's report was compiled. The record is entirely silent that the books were correctly kept by some person whose duty it was to keep the books as a part of his regular course of business.

We sustain this assignment. Stark v. Burkitt, 103 Tex. 437, 129 S. W. 343, 344; Baldridge v. Penland, 68 Tex. 441, 4 S. W. 565.

In Stark v. Burkitt, supra, the Supreme Court lays down the following rule: "To authorize the introduction of book accounts in evidence, it must be proved: (1) That the book or books contain original entries of transactions pertinent to the business in question. (2) It must appear that the entries were made in the regular course of business at or near to the time the transactions were had. (3) That the entries must be such as to indicate what the charge is for; that is, what the transaction was. (4) That the entries were made by one who was authorized to do so, and that he did the acts so recorded himself, or that he made the record upon information derived from one who was authorized to do so. (5) That the transactions were regularly entered, and that the books were correctly kept. 17 Cyc. p. 371 et seq.; Taylor v. Coleman, 20 Tex. 778; Ward v. Wheeler, 18 Tex. 264; Burnham v. Chandler, 15 Tex. 444; Bupp & Robbins v. O'Connor, 1 Tex. Civ. App. 328, 21 S. W. 619. The evidence did not comply with these requirements."

The burden of proof to establish their case rested upon plaintiffs, and because counsel for the defendants cross-examined the witness Charninsky upon a matter which had been referred to in direct examination did not waive their objection to that testimony. Cathey v. M., K. & T. Ry. Co. of Texas, 104 Tex. 39, 133 S. W. 417, 33 L. R. A. (N. S.) 103.

Defendants further assign as error the action of the trial court in refusing to instruct the jury to return a verdict for the defendants because the pleadings and the undisputed evidence as a matter of law show that the sole cause of action against defendants belongs to the Capitol Amusement Company, a corporation, and that plaintiffs have no cause of action either in their individual capacities or as stockholders of the Capitol Amusement Company.

Plaintiffs in their petition allege that the defendants formed a conspiracy which violated the Anti-Trust Laws of the United States (15 USCA § 1 et seq.) and of this state (Rev. St. 1925, art. 7426 et seq.) to prevent plaintiffs from obtaining pictures with which to operate their shows, and that, by reason thereof, the plaintiffs were prohibited from operating picture shows, and therefore were forced out of business and were compelled to sell their business at a great sacrifice.

The general rule announced in 14 C. J., § 1444-C, p. 924, reads as follows: "As a general rule an action to redress or prevent injuries to the corporation cannot be maintained by a stockholder or the body of stockholders in their own names or in the corporate name, but the action must be brought by, and in the name of, the corporation itself. This is true, although the injury to the corporation may incidentally result in the destruction or depreciation of the value of the stock. And the fact that the complaining stockholder is the owner of all or substantially all of the capital stock does not enlarge his rights in this respect. The stockholders cannot as individuals recover on a cause of action vested in the corporation, although all unite in the action."

Many authorities can be cited in support of this rule, some of which are as follows: Evans v. Brandon, 53 Tex. 56; Hamilton v. Cushman Mfg. Co., 15 Tex. Civ. App. 338, 39 S. W. 641; volume 6 Fletcher's Cyc. Corps., § 3768, page 6272; Green v. Victor Talking Machine Co. (C. C. A.) 24 F.(2d) 378, 59 A. L. R. 1091; Thompson on Corporations (3d Ed.) 7th vol. p. 593, § 5595.

In reaching his final conclusion in this case, Chief Justice Gallagher says: "The cause of action for injury to or destruction of the property of a corporation or the impairment or destruction of its business is nevertheless vested in the corporation, as distinguished from its stockholders. In such cases the injury to the corporation is direct and the injury to the holders of its stock remote. A recovery by the corporation inures to their benefit in proportion to their respective holdings and affords them compensation for the indirect or consequential loss sustained by them" (citing authorities).

The foregoing general rule announced by the text-writers and decisions is predicated upon the proposition that the rights of the stockholders are merged in the rights of the corporation, and, if the stockholders sustained any loss or injury, it would inure to the corporation and to the individual stockholders in proportion to their respective holdings in the company.

However, the rule stated above is not so inflexible that it has no exceptions. In 14 C. J. § 1445-B, p. 929, it is said: "The general rule does not prevent stockholders from suing to restrain, or recover damages for, wrongful acts which are not only wrongs against the corporation but also violations of duties arising from contracts or otherwise and owing directly to the injured stockholders."

It is earnestly contended by plaintiffs that the Capitol Amusement Company figured only incidentally in the suit filed by them against the defendants; that it was the ruthless and illegal acts of defendants that drove them out of the moving picture business, and that, by reason of such acts on the part of defendants, plaintiffs were not permitted to continue, either through a corporation or individually, in the moving picture business in which they had been successfully engaged for many years.

Plaintiffs further contend that the general rule stated does not apply to their cause of action; that they were injured in a way that the corporation, which owned no physical assets and had no interest in the lease, could not have suffered injury; that this suit was not filed to redress the wrongs, if any, the corporation suffered; they sued for the wrong suffered by plaintiffs individually. In support of their contentions, plaintiffs cite, among others, the following authorities: Aransas Pass Harbor Co. v. Manning, 94 Tex. 558, 63 S. W. 627; Pacific Fire Insurance Co. v. Morris (Tex. Com. App.) 12 S.W.(2d) 971; Ritchie v. McMullen (C. C. A.) 79 F. 522, 533; Vierling v. Baxter, 293 Pa. 52, 141 A. 728, 729; St. Johnsbury & L. C. Railway Co. v. Hunt, 55 Vt. 570, 45 Am. Rep. 639; 14 C. J. § 1445–b p. 929.

In the case of Ritchie v. McMullen, supra, in an opinion by Judge Taft, who afterwards became Chief Justice of the Supreme Court of the United States, in answer to the contentions made "that the wrongs committed were injuries to the corporations only, and that Ritchie, as a stockholder, could have no redress directly against the wrongdoers, and must find a remedy, if at all, in the enhancement in value in his stock caused by a recovery of damages by the corporation," said: "As the very object of the conspiracy and wrongs done was to cause Ritchie to cease to be a stockholder, it might be difficult to point out how such an indirect remedy could benefit him after the wrong had been completed and he had parted with his ownership of the stock. It is undoubtedly true, as the circuit court held, that a stockholder, merely as such, cannot have an action in his own behalf against one who has injured the corporation, however much the wrongful acts have depreciated the value of his shares. Smith v. Hurd, 12 Metc. (Mass.) 371 [46 Am. Dec. 690]; Allen v. Curtis, 26 Conn. 456; Wallace v. Bank, 89 Tenn. 630, 15 S. W. 448 [24 Am. St. Rep. 625]; Hersey v. Veazie, 24 Me. 1 [41 Am. Dec. 364]; Conway v. Halsey, 44 N. J. Law, 462; Porter v. Sabin, 149 U. S. 478, 13 S. Ct. 1008 [37 L. Ed. 815]. But we are of opinion that this principle has no application where the wrongful acts are not only wrongs against the corporation, but are also violations by the wrongdoer of a duty arising from contract or otherwise, and owing directly by him to the stockholders."

The foregoing rule announced by Judge Taft in the case of Ritchie v. McMullen was cited with approval in the case of General Rubber Co. v. Benedict, 215 N. Y. 18, 109 N. E. 96, L. R. A. 1915F, 617.

In the case of Vierling v. Baxter, supra, the rule announced by Judge Taft, already quoted, was approved, and in the opinion in that case the Supreme Court of Pennsylvania said: "The action of the lower court was based on the conclusion that the wrongs complained of were to the corporation and all the stockholders and could be redressed only by the corporation or in its name. No fault can be found with this legal principle where the facts justify it; but the gravamen of plaintiff's complaint is not damage to the corporation or to stockholders in general, but to himself individually. He avers that by reason of the fraudulent conspiracy he was deprived of his patents, of his machinery, of his stock, of his salary, of his royalties, etc. So far as these wrongs or any of them were committed against him personally, there is no reason why the action may not be maintained."

We think the rule is settled in this state that a stockholder, merely as such, cannot have an action in his own behalf against one who has injured the corporation, however much the wrongful acts have depreciated the value of his shares. 14 C. J. § 1444–c, p. 924; Evans v. Brandon, 53 Tex. 56; Hamilton v. Cushman Mfg. Co., 15 Tex. Civ. App. 338, 39 S. W. 641; Thompson on Corporations (3d Ed.) vol. 7, p. 593, § 5595.

It is also settled that, if a suit is brought for and on behalf of the corporation, the burden rests upon plaintiff to allege and prove that the plaintiff has in good faith made an effort to obtain action by the corporation or must allege and prove such a state of facts as to clearly show that an appeal to the directors or stockholders would be in vain. If it appears that the wrongdoers are in complete control and management of the corporation, this fact dispenses with the necessity of an appeal to them or the corporation. Barthold v. Thomas (Tex. Com. App.) 210 S. W. 506.

It is well to keep in mind that modern business methods have created new and complex conditions, resulting in the formation of many combinations of capital and power. Much legislation has been enacted curbing the power of trusts and monopolies. Our federal and state laws condemn trusts and monopolies, and they are considered inimical to the public welfare and against public policy. We are in entire accord with the proposition that the well-recognized rules of law and equity should not be so strictly construed as to produce an irremediable situation or a total failure of justice, but, under proper pleadings and proof, those rules should, if necessary, be relaxed to promote the ends of justice and to furnish the litigant a forum in which to redress his alleged wrongs.

In applying these principles, we think it equally well settled that, if it appears from the pleadings and the proof that the wrongful acts are not only wrongs committed against the corporation, but also violations of duties arising from contracts or otherwise and owing directly to the injured stockholders, the

stockholder should be permitted to file and maintain a suit for injuries sustained as a stockholder and as an individual. 14 C. J. § 1445–b, p. 929; Ritchie v. McMullen, supra; Vierling v. Baxter, supra.

Since this case will be reversed and remanded for a new trial, we suggest that, in our opinion, plaintiffs have not, in the development of this phase of the case, sufficiently complied with the exceptions to the general rule herein stated.

We forego a consideration of the other assignments presented, because they will not likely arise during another trial.

For the reasons herein stated, we recommend that the judgment of the Court of Civil Appeals reversing and remanding this cause to the trial court for another trial be affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals reversing the judgment of the district court is affirmed, and the cause remanded for a new trial in accordance with the opinion of the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.