544 So.2d 845 (1989)
Jessie Willard SHELTON, et al.
v.
Wallace H. THOMPSON, et al.
86-771.
Supreme Court of Alabama.
January 13, 1989.
Rehearing Denied May 5, 1989.
*846 Frank J. Tipler, Jr. and John M. Pennington of Tipler and Tipler, Andalusia, and Michael L. Weathers, Montgomery, for appellants.
J.R. Brooks of Ford, Caldwell, Ford & Payne, Huntsville, for appellee Wallace H. Thompson.
Palmer C. Hamilton and George A. LeMaistre, Jr. of Miller, Hamilton, Snider & Odom, Mobile, for appellees Colonial Bank of Northwest Alabama and The Colonial Bancgroup, Inc.
John R. Chiles of Sirote, Permutt, McDermott, Slepian, Friend, Friedman, Held & Apolinsky, Birmingham, for appellee, G. Scott Ray.
Robert O. Cox of Poellnitz, Cox & Jones, Florence, for appellees Neil G. Wilcoxson, Sam Hammond, and Malcolm Davis.
PER CURIAM.
This appeal is from a summary judgment in favor of all the defendants in a derivative action involving the merger of the Bank of Lexington ("Lexington") and Colonial BancGroup ("Colonial").
On January 12, 1985, a proposal was made to the stockholders of Lexington to merge Lexington into Colonial by means of a two-part transaction: 1) Lexington shares would be exchanged for shares in Colonial; and 2) Lexington would be merged into Colonial's wholly-owned subsidiary, Colonial Bank of Northwest Alabama. A majority of Lexington stockholders accepted the proposal and the transaction was completed on June 19, 1985. On that date Lexington ceased to exist as a corporate entity.
The plaintiffs (former Lexington stockholders) filed this lawsuit on November 5, 1985, on behalf of themselves, other unnamed stockholders similarly situated, and derivatively on behalf of Lexington against the defendants (certain officers and directors of Lexington and, by amendment, of Colonial). The plaintiffs claimed that the individual defendants had made bad or fraudulent loans of approximately $5 million in breach of their fiduciary duties with regard to the proposed merger between Lexington and Colonial, thereby causing injury to Lexington and to the individual plaintiffs (specifically, that the loans depleted the assets of Lexington and damaged the business and reputation of Lexington). The amended complaint, which added Colonial as a defendant, also alleged that Colonial had acted in duplicity with the originally named defendants to wrongfully deprive the plaintiffs of their cause of action through the means of merger.
The defendants filed motions to dismiss, asserting that 1) the plaintiffs had failed to allege facts sufficient to allow the plaintiffs *847 to sue and recover individually; 2) that the plaintiffs had failed to comply with Rule 23.1, A.R.Civ.P.; and 3) that as nonstockholders of Lexington, the plaintiffs lacked standing to sue derivatively (i.e., that the corporation on whose behalf the plaintiffs were suing had been merged out of existence and the plaintiffs could not have been stockholders at the time suit was filed).
The grounds asserted in the motions to dismiss were supported by the affidavit of defendant G. Scott Ray (former Lexington officer and director). Ray stated that the plaintiffs, at the time of the merger, had exchanged their Lexington shares for Colonial shares, and that the defendants did not constitute a majority of the directors of either Colonial BancGroup or Colonial Bank of Northwest Alabama or the now non-existent Lexington; and, therefore, that demand on the Board would not have been futile. The plaintiffs admitted that they had not made demand upon the Lexington directors to institute this action; rather, they contended that the totality of their averments comported with the "futility of notice" exception of Rule 23.1.
The motions to dismiss were accompanied by motions for protective orders, requesting a stay of discovery until the court could rule on the motions to dismiss. The motions for protective orders were granted pending a "status conference" to determine the discovery necessary for the plaintiffs to adequately respond to the motions to dismiss. However, the protective orders were never lifted after the status conference was held.
The trial court, treating the defendants' motions to dismiss as motions for summary judgment under Rule 12(b), entered a summary judgment in favor of all the defendants, reasoning that the plaintiffs did not have standing to sue on behalf of Lexington because they were no longer stockholders of Lexington, and that the plaintiffs did not have standing to sue on their own behalf because the alleged wrongs were to the corporation. The trial court also found that the amended complaint was due to be dismissed because it alleged a conspiracy to keep the plaintiffs from suing individually when, in fact, the plaintiffs had no right to sue individually. The trial court did not address the issue of noncompliance with the notice requirements of Rule 23.1.
We affirm that portion of the summary judgment as it relates to the plaintiffs' claim on their own behalf. Whatever damages the plaintiffs may have suffered were incident to their status as stockholders; and whatever recovery may be effected by the derivative action inures to the benefit of all innocent stockholders and not to the plaintiff stockholders individually. Green v. Bradley Construction, Inc., 431 So.2d 1226 (Ala.1983); see, also, Stevens v. Lowder, 643 F.2d 1078 (5th Cir.1981).
Initially, we were also disposed to affirm the summary judgment in favor of defendant Colonial. Certainly, the mere fact of merger, even in the face of Lexington's depleted worth resulting from the alleged wrongdoing of the originally named defendants, creates no liability on the part of Colonial; and the plaintiffs bear the burden of proving that Colonial, acting in duplicity with the individual defendants, who were former officers and directors of Lexington, committed tortious actionable conduct. Where, as here, however, the trial court barred discovery until the "standing" issue could be resolved, summary disposition of the claim in favor of Colonial was premature. Moreover, particularly if the derivative plaintiffs fail to prove Colonial's culpability, nothing in this opinion, nor other legal principles, to our knowledge, would preclude Colonial, as a matter of law, from exercising its right to seek realignment as a party-plaintiff, if it so chooses, with permission of the court, to prosecute the claims on behalf of the innocent former stockholders of Lexington. Therefore, the summary judgment in favor of Colonial is reversed.
As to the plaintiffs' derivative claim against the remaining defendants, the summary judgment appealed from is reversed and the cause is remanded for further proceedings. (All future references to "the plaintiffs" and "the defendants" are to the derivative plaintiffs and to the parties defendant *848 as named in the complaint as amended.)
We agree with the plaintiffs' contention that, because of the trial court's ban on discovery, the entry of summary judgment, with respect to certain of its aspects, was premature. We further agree with the defendants' position, however, that not only is the trial court's stated "substantive standing" ground reviewable, but that we are not limited in our review to those grounds stated in the trial court's order. The defendants asserted in the trial court, and have asserted on appeal, in support of affirmance, that the plaintiffs had failed to meet the threshold procedural requirements of Rule 23.1, which provides:
"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."
Because neither the "substantive standing" issue nor the "procedural notice" issue, including the "futility of notice" exception, is dependent on, or subject to, the plaintiffs' opportunity for further discovery, and because the judgment is due to be affirmed if either the defendants' "procedural noncompliance" argument or their "substantive standing" argument is sustained on appeal, we now address those issues.

The Substantive Standing Issue
The defendants' first "lack of standing" contention is that, as a matter of substantive law, once the plaintiffs lost their stockholder status in Lexington, they lost their standing to prosecute a derivative action. Unquestionably, this is the rule where, under ordinary circumstances, the stockholder voluntarily divests himself of any interest in the corporation. Of course, where a stockholder sells his stock, either to the corporation or to a third party, that stockholder, generally speaking, can not claim standing to maintain a derivative action on behalf of the corporation in which he no longer owns an interest. Green v. Bradley Construction, Inc., supra; see, also, Empire Realty Co. v. Harton, 176 Ala. 99, 57 So. 763 (1911) (holding that the plaintiff, who had surrendered his stock involuntarily as a consequence of a levy of execution, lost his standing to maintain a derivative suit).
The defendants, however, would have this Court take this proposition one step further and apply the rule to these plaintiffs, who are now non-stockholders of Lexington because of its merger with Colonial. We decline to so hold. To so extend the rule is to materially change the rule and thus to violate one of the most basic tenets of jurisprudence: that lack of standing should not be applied to abolish an existing substantive right of action. Such a rule would allow an otherwise valid and actionable derivative suit against an officer of the corporation to be abated simply by effecting a merger with another corporation, as if the mere act of merger wipes out the alleged culpable conduct.
The defendants respond to the "abatement of the claim" problem by insisting that the plaintiffs are not without a remedy: *849 They could seek to enjoin the merger. But the very facts of this case, as alleged, refute this alternative-remedy suggestion: 1) The merger had already occurred when the actionable wrongdoing was discovered; and 2) whether to enjoin the merger, under the circumstances of Lexington's depleted assets, is a matter of prudencea judgment callwhich may depend, among other things, upon whether Colonial is jointly liable for the alleged wrongdoing. Absent a showing of Colonial's culpability (a fact yet to be determined), it may develop that Colonial merely seized upon the legitimate opportunity to "pick up the pieces"; and, given Lexington's impoverished condition, the merger may well have been a blessing, and not a curse, to those stockholders innocent of any wrongdoing. The suggested remedy of injunction, then, was, at best, imprudent; and, at worst, impossible.
We are aware of state and federal precedents to the contrary. See, e.g., Lewis v. Anderson, 477 A.2d 1040 (Del.1984); Portnoy v. Kawecki, 607 F.2d 765 (7th Cir. 1979); Issen v. J.S.C. Enterprises, Inc., 508 F.Supp. 1278 (N.D.Ill.1981); Heit v. Tenneco, 319 F.Supp. 884 (Del.1970); Kreindler v. Marx, 85 F.R.D. 612 (N.D.Ill. 1979); and Basch v. Talley Industries, Inc., 53 F.R.D. 9 (S.D.N.Y.1971). By their blind adherence to the absolutism of the "stockholder status" prerequisite, these cases use "lack of standing" to abolish the remedy. We refuse to adopt such a rule.

The Procedural Standing Issue
We begin our discussion of this issue by quoting from what we find to be a good statement of the development of, and the philosophy behind, the Rule 23.1 derivative action:
"A cardinal rule of corporate law is that directors, rather than shareholders, manage the business and affairs of a corporation. Newton v. Hornblower, 224 Kan. 506, 582 P.2d 1136 (1978). Accordingly, the authority to sue for corporate injuries is primarily in the corporate management. In re Kauffman Mutual Fund Actions, 479 F.2d 257 (1st Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973). However, a shareholder is not powerless to challenge director action which results in harm to the corporation. `The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management.' Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984). The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it. The nature of the action is twofold. First, it is the equivalent of a suit by the shareholder to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it. Aronson v. Lewis, 473 A.2d at 811.
"By its very nature, the derivative action impinges on the managerial freedom of directors. In Lewis v. Graves, 701 F.2d 245, 246 (2d Cir.1983), the court aptly observed:
"`A derivative suit often brings into the litigation arena parties holding widely divergent views as to how the affairs of a corporation can best be conducted. Directors of a corporation ordinarily believe that they have been good stewards of corporate assets. They also believe that, by virtue of their offices, they are in a better position to decide whether it is in the corporation's best interests to pursue remedies for alleged wrongs committed against it. A derivative plaintiff, on the contrary, usually has little or no confidence that the corporation's directors will pursue remedies designed to correct alleged wrongdoing. Like darkened ships passing in the night, neither has a fair view of the other.'
"Hence, the demand requirement of Rule 23.1 exists at a threshold `"to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs."' Elfenbein v. Gulf & Western Industries, *850 Inc., 590 F.2d 445, 450 (2d Cir.1978), quoting Brody v. Chemical Bank, 517 F.2d 932, 934 (2d Cir.1975).
"The requirement for demand upon directors by a plaintiff who pursues the extraordinary remedy of a derivative suit has been recognized in this country for over a century. See Hawes v. Oakland, 104 U.S. (14 Otto) 450, 26 L.Ed. 827 (1882). The requirement, first established by the Supreme Court and now codified in Rule 23.1, represents `a procedural resolution of the tension between the usual directive that a board of directors conduct the affairs of the corporation and the power given to shareholders to remedy corporate directors' misfeasance, malfeasance, and nonfeasance by instituting actions on behalf of the corporation.' Allison v. General Motors Corp., 604 F.Supp. [1106] at 1112 [(D.Del.1985)]. In Allison, the court went on to make the following observation:
"`[R]ule 23.1 recognizes that it is sometimes necessary to have shareholders police, enforce, and indeed assume the directors' duties of corporate governance. However, Rule 23.1 also acknowledges that because shareholders could be overzealous in their enforcement actions, there must be rules to "police the police."'
"604 F.Supp. at 1112.
"Practically speaking, the demand requirement promotes a form of `alternative dispute resolution'that is, the corporate management may be in a better position to pursue alternative remedies, resolving grievances without burdensome and expensive litigation. See Lewis v. Graves, 701 F.2d at 247. Deference to directors' judgment may also result in the termination of meritless actions brought solely for their settlement or harassment value (`strike suits'). Aronson v. Lewis, 473 A.2d at 812. Moreover, where litigation is appropriate, the derivative corporation will often be in a better position to bring the suit because of superior financial resources and knowledge of the challenged transaction. Lewis v. Graves, 701 F.2d at 248.
"Despite the strong policy and practical advantages favoring exhaustion of intracorporate remedies, the demand requirement of Rule 23.1 is not without exception. A shareholder may be allowed to assume control of litigation on the corporation's behalf without first affording the directors the opportunity to occupy their normal status by making demand, if the shareholder can show his case is exceptional or, in other words, that demand would be a futile, useless exercise. Thus, the shareholder must demonstrate a degree of antagonism between the directors and the corporate interest such that the directors would be incapable of doing their duty. In Re Kauffman Mutual Fund Actions, 479 F.2d at 263.
"Under Rule 23.1 the plaintiff must allege with factual particularity the reasons why demand is futile and should be excused. The burden is on the plaintiff to show that the requirements of the rule have been satisfied. In Re Kauffman Mutual Fund Actions, 479 F.2d at 263. This Court must then determine, solely on the basis of the complaint, whether the plaintiff has met this burden; whether `any set of facts [is] shown that would prove futility.' Newton v. Hornblower, 224 Kan. at 511, 582 P.2d at 1136. All well-pled facts are assumed to be true. Tabas v. Mullane, 608 F.Supp. [759] at 765 [(D.N.J.1985) ]. The decision as to whether plaintiff's allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies solely within the discretion of the trial court. Lewis v. Graves, 701 F.2d at 248; Newton v. Hornblower, 224 Kan. at 511, 582 P.2d 1136; see, also, deHaas v. Empire Petroleum Co., 435 F.2d 1223 (10th Cir.1970). This standard does not mean a court will be lenient in finding there are sufficient facts pled to establish futility. Rather, it means that if the court finds sufficient facts are pled, then it will be lenient in excusing demanda matter within its discretion. As noted in Lewis v. Curtis, 671 F.2d 779, 784 [ (3rd Cir.1982) ], `because of the important policy *851 behind this rule, "the demand requirement of Rule 23.1 should be rigorously enforced."' (Quoting Cramer v. GT & E Corp., 582 F.2d 259, 275 (3d Cir.1978), cert. denied 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).
"...
"The vast majority of federal courts hold that `where mere approval of the corporate action, absent self-interest or bias, is the sole basis for establishing the directors' "wrongdoing" and hence for excusing demand on them, plaintiff's suit should ordinarily be dismissed.' In Re Kauffman Mutual Fund Actions, 479 F.2d at 265 (emphasis added). [Further cites omitted.]"
Kaufman v. Kansas Gas & Electric Co., 634 F.Supp. 1573, at 1577-79 (D.Kan.1986). For a brief history of the equitable remedy of derivative action, see Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). See, also, Tuscaloosa Mfg. Co. v. Cox, 68 Ala. 71 (1880); and Roberts v. Alabama Power Co., 404 So.2d 629 (Ala. 1981).
In the ordinary case, as the discussion in Kaufman indicates, the ultimate merits of the derivative claim are unrelated to, and the plaintiffs' derivative right to relief can be easily separated from, their burden to comply with the notice requirements of Rule 23.1. Additionally, under ordinary circumstances, a derivative plaintiff is not entitled to await further discovery to more fully aver with specificity an excuse for failure to so comply. But this is not the ordinary case. In the "merger" context in which the issue is here presented, the allegations of wrongdoing on the part of the defendants, as former officers and directors of Lexington, underlie the very essence of the plaintiffs' derivative right of redress.
Initially, two factors are readily apparent: 1) These plaintiffs, either individually or as representatives of Lexington, could never revive and operate Lexington as a viable corporate bank; and 2) Colonial, because of self-interest in the pre-merger context, understandably, would not exercise the right of action. (If Colonial should prevail in such an action, it would necessarily increase its cost of merger.) Admittedly, these two practical considerations, standing alone, are insufficient to excuse non-compliance. When factored into the full equation, however, these circumstances are sufficient, as a matter of law, to defeat summary judgment.
Critical to our determination is the given fact that, although less than a majority of Lexington's directors are charged with wrongdoing, a majority voted Lexington out of existence. While this "ceased to exist" action on behalf of the corporation did not affect its legal capacity to seek redress, it was a strong expression of its factual unwillingness to exercise the right of action and its concomitant willingness to effect merger on terms potentially less favorable to its stockholders.
In essence, then, the derivative plaintiffs, as stockholders of Lexington, claim that Lexington's directors approved a plan of merger with Colonial under circumstances of Lexington's vastly depleted assets, and that the depletion of assets resulted from legally cognizable misconduct on the part of certain of Lexington's officers and directors. In other words, according to these plaintiff stockholders, Colonial's "buy-out" price was materially less than Lexington's true value, taking into account Lexington's chose in action against those legally responsible for its depleted worth.
The plaintiffs' conclusory allegations with respect to the "futility of notice," which ordinarily would be insufficient, find their requisite support, under these special circumstances, in the further specific allegations with respect to the merits of the claim. Taking as true (as we must, in this posture of the case) the material allegations of wrongdoingmismanagement and fraud resulting in depleted assets, plus a "bail out" mergerwe find that they clearly demonstrate the futility of any stockholders' notice to Lexington's directors to proceed on behalf of the corporation to recoup the resultant losses. In the very nature of Lexington's final corporate act, those charged with acting on such notice *852 have foreclosed any likelihood of their exercising the right of action.
In conclusion, we emphasize that our holding, as a matter of law, is limited to the two threshold aspects of the plaintiffs' burden of proof: 1) the plaintiffs' substantive standing to prosecute the derivative action; and 2) the plaintiffs' compliance with the procedural requirements of Rule 23.1. Nothing we have said in the disposition of the "standing to sue" issues here presented is to be construed as expressing an opinion on any of the issues yet to be resolved on remand of this cause.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, JONES, SHORES and ADAMS, JJ., concur.
HOUSTON and STEAGALL, JJ., concur in part and dissent in part.
TORBERT, C.J., dissents.
BEATTY, J., recuses.
HOUSTON, Justice (concurring in part and dissenting in part).
I concur with the portion of the opinion that affirms the summary judgment as it relates to the plaintiffs' claim on their own behalf.
Colonial BancGroup was added as a party by the June 6, 1986, amendment to the complaint. This amendment is not verified. Rule 23.1, A.R.Civ.P., provides that "the complaint shall be verified." Rule 11, A.R. Civ.P., provides that verification is unnecessary except where otherwise specifically provided by rule or statute. Rule 23.1 is an example of a rule within the exception found in Rule 11. I would affirm the summary judgment in favor of Colonial.
In Corona v. Southern Guaranty Ins. Co., 294 Ala. 184, 314 So.2d 61 (1975), this Court held that under Rule 10(a), A.R. Civ.P., the caption of the complaint and not the body establishes those parties who are before the court. If we strictly adhere to Corona, then we must conclude that the plaintiffs were before the court only in their individual capacities and did not sue in a derivative action under Rule 23.1, A.R. Civ.P. Corona, while reaching a correct result under the facts of that case, is apparently against the weight of authority in holding that the caption and not the body of the complaint establishes those parties who are before the court. 5 Wright & Miller, Federal Practice and Procedure: Civil § 1321 n. 6 (1969). I would expressly overrule that portion of Corona by holding that the body of the complaint can be examined to determine the capacity of the parties before the court. Therefore, I would concur with the majority as to the plaintiffs' derivative claim against defendants Wallace H. Thompson, Sam Hammond, Gilbert Hammond, Neil G. Wilcoxson, Malcolm E. Davis, and G. Scott Ray, since they were defendants in the original complaint, which was verified.
STEAGALL, Justice (concurring in part, dissenting in part).
I agree with that part of the majority opinion affirming the summary judgment as it relates to Shelton's individual claims. However, because I believe the requirements of the futility-of-notice exception to the demand requirement set out in Ala.R. Civ.P., Rule 23.1, have not been met, I must dissent from that part of the majority opinion reversing the summary judgment as to Shelton's derivative claims.
TORBERT, Chief Justice (dissenting).
Because my analysis of the facts of this case diverges from the very outset from that of the majority, I must respectfully dissent. I agree with the majority that there is a sparsity of authority precisely apposite to the instant case. With that premise, which I hope suffices to explain the dearth of citations squarely on point in my opinion, my agreement with the majority ceases, however, and my position is diametrically opposed to that of the majority.

I.
I turn my attention first to the plaintiffs' derivative claims. To recapitulate briefly, the plaintiffs' derivative claims were purportedly brought on behalf of the Bank of *853 Lexington ("Lexington") against various individuals who had been, prior to the merger, officers and directors of Lexington. The general tenor of these claims is that the individual defendants damaged Lexington by engaging in, in the majority's words, "bad or fraudulent loans of approximately $5 million." The trial court dismissed these claims, essentially because the plaintiffs lacked standing. I agree, and I would affirm that disposition. The majority reverses, however, on the grounds that any efforts at demanding action from the board of directors, as Rule 23.1, Ala.R. Civ.P., requires as a condition precedent to bringing a derivative action, would have been futile and the performance of that condition is thus excused; furthermore, the majority unnecessarily manufactures standing merely because a merger has taken away the plaintiffs' recourse on behalf of Lexington that derived from Lexington's existence.

A.
To whom would the shareholders' notice be tendered? Clearly, the majority does not suggest that the "futility" exception to Rule 23.1 attaches to notice that might have been tendered to Lexington's directors. On June 19, 1985, the merger was completed and Lexington, as an entity, ceased to exist. The body of individuals comprising the head of that creature, the board of directors, simultaneously faded from existence. Thus, as of June 19, 1985, there was no Lexington board of directors to whom notice could be given. Without the possibility of giving notice, to what does the "futility" exception attach? To whom was an attempt at giving notice futile? In my mind, the "futility" exception contemplates that notice could be given, that a body existed to receive notice; here, notice could not be given, for no body existed to receive it. If, therefore, the plaintiffs were incapable of giving notice to Lexington's directors in the first place, it makes little sense to say that giving notice would be futile (except to the extent that it is obviously futile to ask a non-existent board to take action).
Moreover, it is well settled that one who does not own stock in a corporation at the time the suit is filed is not qualified to bring a derivative action on that corporation's behalf. See, e.g., Green v. Bradley Construction, Inc., 431 So.2d 1226 (Ala. 1983). The merger, occurring on June 19, 1985, was effectuated by Lexington shareholders' exchanging their Lexington shares for shares in Colonial Bancgroup, Inc., owner of all outstanding stock of the corporation with which Lexington merged, Colonial Bank of Northwest Alabama ("Colonial"). On November 5, 1985, the time when the lawsuit was filed, there was in reality no stock of Lexington in existence; Lexington itself no longer existed. The plaintiffs, therefore, could not have owned stock in Lexington, and, as a consequence, could not possibly have qualified to bring a derivative action on Lexington's behalf. Ala.R. Civ.P. 23.1.
Based on the foregoing, it is apparent to me that the majority's holding does not for its underpinning rely on the premise that the "futility" exception to the notice requirement applied to any notice that might have been given to Lexington's board of directors.

B.
The unavoidable conclusion, then, is that the majority considers that any attempt by the plaintiffs to give notice to Colonial's directors would have been futile. This result rests upon the premises 1) that the plaintiffs, at the time the lawsuit was filed, owned shares of Colonial's stock; 2) that the plaintiffs sought to have a right or obligation enforced on Colonial's behalf; and 3) that the plaintiffs either had provided Colonial with notice or were in a position to prove that exercise futile. The record supports none of this, however.
It is neither pleaded nor argued that the plaintiffs, at the time the lawsuit was filed, owned Colonial stock. Assuming they did own such stock, the plaintiffs' appellate brief, the findings of the trial court, and the complaint itself all verify one fact: that the derivative claims are asserted on Lexington's behalf, not Colonial's. Further, *854 there is no allegation that the plaintiffs ever gave, or attempted to give, notice to Colonial's board of directors, or that notice to Colonial's directors would be futile.
In Overberger v. BT Financial Corp., 106 F.R.D. 438 (W.D.Pa.1985), shareholders of Laurel National Bank ("LNB") brought a derivative action against the officers and directors of LNB, alleging that the defendants had fraudulently or negligently made loans in violation of state and federal law. During the pendency of the litigation, LNB became a wholly owned subsidiary of BT Financial Corporation ("BT"). LNB was converted to a state bank, reincorporated, and then merged with Interim BT Bank, another BT wholly owned subsidiary, with the reincorporated state bank as the survivor. LNB shareholders received BT stock plus cash for their LNB stock. The dilemma faced by the court was whether the plaintiffs, after the stated series of transactions, still had standing to prosecute the claims:
"In the present situation Rule 23.1 can operate as a `Catch 22'. As noted, Rule 23.1 requires that the plaintiff be a shareholder at the time of suit and maintain this status throughout the litigation. Rule 23.1 also requires that the plaintiff must have been a shareholder at the time of the transaction, the contemporaneous ownership rule. Plaintiffs can no longer maintain the action because they no longer have shareholder status. The individual defendants contend BT cannot maintain the action because it was not a shareholder at the time of the transaction. If this is so, no party can maintain the action.
"No court has approved such a result. In Lewis v. Chiles [719 F.2d 1044 (9th Cir.1983) ], the court observed that a suit by a corporation which acquires a derivative cause of action as one of the assets of a purchased corporation would violate the contemporaneous ownership requirement of Rule 23.1, 719 F.2d at 1048 n. 4, but also observed that only the acquiring corporation had an interest in pursuing the claims. Id. at 1047. Without discussion of the problem, other courts have assumed that the acquiring corporation or its shareholders can maintain the action."
Overberger, 106 F.R.D. at 443 (emphasis added) (additional citations omitted). I believe that Chief Judge Teitelbaum reached the correct result, one that is not contrary to my views in this case. I again stress that, in my opinion, the plaintiffs' pleadings in this case, insofar as the derivative claims are concerned, are simply fatally defective in that 1) there is no allegation that the plaintiffs owned Colonial stock at the time the lawsuit was filed; 2) there is no allegation that the claims are pressed on Colonial's behalf; and 3) there is no allegation that demand on Colonial's directors was made or that such a demand would be futile. In other words, I do not suggest that the Lexington-Colonial merger extinguished all derivative claims; rather, the complaint, as framed and as attacked by the defendants, demonstrates neither the plaintiffs' standing nor their capacity to press the derivative claims against Lexington's directors.
For the sake of intellectual honesty and complete analysis, I will assume for the purposes of discussion here that Colonial, at the time the lawsuit was filed, stood in Lexington's shoes to the extent that its rights could properly be represented by these plaintiffs' derivative attempts to seek justice for their corporation.[1] Because no notice was given to the directors of Colonial, whether such an act would have been futile is the appropriate inquiry. In my opinion, notice would certainly not have been futile.
If, as alleged, Lexington's directors made "bad or fraudulent loans of approximately *855 $5 million" prior to the Lexington-Colonial merger, then Colonial, on June 9, 1985, presumably took on assets worth $5 million less than they were potentially worth. If, as alleged, this deflated value was the product of illegal or fraudulent conduct on the part of Lexington's directors, then Colonial would presumably deem it desirable and appropriate to seek redress for a loss occasioned by persons who, at the time of the loss, were outside the Colonial corporate structure.[2] If that presumption is correct, and I believe that it is, then for the plaintiffs to give notice to Colonial's directors before bringing a derivative action would not be futileit would be imperative, given that "the demand requirement of Rule 23.1 should be rigorously enforced." Cramer v. GT & E Corp., 582 F.2d 259, 275 (3d Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); see Lewis v. Curtis, 671 F.2d 779, 784 (3d Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); see also Rezner v. Fairhope Single Tax Corp., 292 Ala. 456, 296 So.2d 166 (1974) (demand deemed unnecessary only when futility clearly appears); Goldman v. Jameson, 290 Ala. 160, 275 So.2d 108 (1973) (demand deemed unnecessary only when futility can be inferred with reasonable certainty); and Decatur Mineral & Land Co. v. Palm, 113 Ala. 531, 21 So. 315 (1896) (futility will not be presumed). Because no notice was given or demand made by the plaintiffs to the Colonial directors, and, therefore, because compliance with Rule 23.1 is lacking, I believe that the trial court correctly dismissed the derivative claims.
Based on the foregoing, I reach the exact opposite result on the derivative claims from that reached by the majority. I now direct my lonely pen to the plaintiffs' individual claims.

II.
As the majority rightly points out, the procedural posture of this case requires us to draw all inferences raised by the pleadings in favor of the plaintiffs. It also deserves mention at this point that, due to a protective order imposed by the trial court, the plaintiffs have been precluded from conducting any discovery whatsoever.

A.
The majority states, "Whatever damages the plaintiffs may have suffered were incident to their status as stockholders." I disagree. If there existed a shareholders' bill of rights, it would undoubtedly include the right for shareholders to make an informed decision, based on objective, honest, and candidly disclosed data, regarding whether they would dissent from or ratify any proposed unalterable changes in the structure of the corporation that they own. See Code 1975, § 10-2A-162(a)(1) (all shareholders of a corporation "shall have the right to dissent from ... any plan of merger") and Commentary thereto; Code 1975, § 10-2A-163 (implementation of dissenters' rights). Such a right is fundamental; the most basic tenet of an individual's ownership of any interest must be the right to dispose of or to retain that which he owns.[3] If his ownership is a small part of a larger, community holding, then his right comprises at least the opportunity to have his desires known. Such is a democratic principle that inheres in every corporation; the corporation must respond to the will of those who own it, those who finance it, those who dictate whether it will maintain its vitality as a legal entity. It is also fundamental that the invasion of a vested legal right, created and conferred by law, requires us to provide a remedy. Marbury *856 v. Madison, 5 U.S. (1 Cranch) 137, 163-64, 2 L.Ed. 60 (1803); see Gully v. First Nat. Bank, 299 U.S. 109, 117-18, 57 S.Ct. 96, 99-100, 81 L.Ed. 70 (1936) (per Cardozo, J.); Ala. Const. of 1901, § 13.
The record in this case, albeit a thin one, viewed most favorably to the plaintiffs, discloses that the directors of Lexington silenced the voices of the shareholders so that no objection to the impending merger could be timely raised. Not until after the merger was complete did the plaintiffs learn of the misconduct or malfeasance of the directors of the corporation they owned. Only after the merger was complete did the plaintiffs learn that circumstances existed that presumably would have led them to dissent from the merger proposal. And only after the merger was consummated did the plaintiffs have reason to believe that Lexington's directors had either misrepresented or concealed Lexington's true financial status. By the time of this discovery, their capacity to bring a derivative action on Lexington's behalf to elicit the truth had been extinguished. The owners' voices had been completely silenced.
The right to dissent, and thus to enjoy fair corporate suffrage, is one personal to the shareholders; it does not belong to the corporation. If that right, through the willful conduct of the directors, is restricted, qualified, or effectively nullified, the shareholders should have the prerogative to seek redress. Any monetary damages would concededly be difficult to calculate with any measure of precision. Such a difficulty, however, to my knowledge, has never sufficed to completely deny one the right to seek redress. For example, there are virtually no criteria by which to assess damages in a libel action, but no one could suggest disallowing that cause of action on that ground. In the context of the present case, if an intentional fraud were proven, the plaintiffs would be entitled to nominal damages and perhaps punitive damages as well. See, e.g., Carnival Cruise Lines, Inc. v. Goodin, 535 So.2d 98 (Ala.1988) (knowledge of falsity of representation plus intent to deceive warrant imposition of punitive damages); American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985) (same); Ex parte Lewis, 416 So.2d 410, 413 (Ala.1982) (Jones, J., concurring) (same).
Once discovery became available to the plaintiffs in this case, they would perhaps be able to marshal sufficient proof that the directors had infected the corporate structure with financial instability. From that point, the plaintiffs would be in a position to depose, or otherwise conduct discovery directed at, the other former shareholders. Would the other shareholders have dissented from the merger proposal if they had had available to them the truth concerning Lexington's balance sheets and the previous imprudent or illegal loan transactions?
What would have happened if the directors of Lexington had made an honest disclosure of the corporation's financial insecurity at the time of the merger proposal? At that time, a derivative action against the directors responsible for the insecure financial status would still have lain. The shareholders might well have wished the directors to make Lexington whole again and, as a result, to maintain Lexington as a viable legal entity. Alternatively, the shareholders might have viewed the merger as a cure. Or, they might have chosen to liquidate their holdings. More importantly they might have sought to enjoin the merger.[4] In any event, the shareholders would have been able to make an informed decision, based on objective, honest, and candidly disclosed data.
Lexington's directors owed its shareholders the same duty arising in any fiduciary relationship. If the duty was breached, redress should be available. Likewise, in my opinion, the directors had a duty not to misrepresent the status of Lexington's financial condition to the shareholders or to fraudulently conceal it from them. Compare Code 1975, § 10-2A-79 ("complete *857 and correct" records of all accounts and transactions must be available to shareholders) with § 10-2A-140 (directors must approve merger plan setting forth accurate terms and conditions of merger) and § 10-2A-142 (such merger plan shall be submitted to and voted on by shareholders). If the directors breached this duty in such a way that the plaintiffs could not make a rational, informed decision on their dissent option, they should be held accountable. For a thorough and highly educational discourse on shareholders' individual causes of action, see Dann v. Studebaker-Packard Corp., 288 F.2d 201 (6th Cir.1961), holding that plaintiff-shareholders, suing in their individual capacities, were entitled to maintain an action against the corporation in which they held stock and against other corporations with which the plaintiffs' corporation conspired, for defrauding the plaintiffs by submitting false or misleading proxies by which several transactions were approved and which caused waste and dissipation of the plaintiffs' corporation's assets. See also Stinnett v. Paramount-Famous Lasky Corp., 37 S.W.2d 145 (Tex. Com.App.1931) (permitting shareholders to sue individually other corporations that conspired to violate state and federal antitrust laws to drive the plaintiffs' corporation out of business); cf. Grogan v. Garner, 806 F.2d 829 (8th Cir.1986). For a further collection of cases permitting shareholders to sue in their individual capacities to seek redress for the violation of their personal rights, see 19 C.J.S. Corporations, § 822 (1940 & Supp.1988); and 12B Fletcher Cyc. Corp. §§ 5915 (listing various types of directors' conduct adequate to support individual causes of action, such as, insofar as are pertinent here, action relating to a shareholder's right to vote at shareholder meetings, conduct depriving the shareholder of his rights as a shareholder, and conduct amounting to deceptive or misleading proxy solicitation) and 5921.

B.
I have expressed the opinion in Part that the plaintiffs could not maintain a derivative action against Colonial in this case, given the trappings of the complaint as it is framed. Nonetheless, the plaintiffs have alleged that they have suffered loss from a conspiracy between Colonial and the directors of Lexington to misinform them as to the financial particulars of Lexington at the time of the merger proposal. Because I believe that Lexington's directors can be held accountable to these plaintiffs suing in an individual capacity, it takes no leap of logic to conclude that if Colonial ratified the actions or encouraged or assisted Lexington's directors in concealing the truth or in misrepresenting material facts, then Colonial can be held accountable for conspiring to defraud the plaintiffs.
The plaintiffs' claim against Colonial is premised upon the allegation that Colonial conspired with Lexington's directors to conceal the true status of Lexington's financial condition. The majority reverses Colonial's summary judgment and suggests that Colonial could be realigned as a plaintiff and then could prosecute this claim in the present plaintiffs' stead. Besides rewriting the complaint (this claim was pleaded in an individual capacity), this solution puts Colonial in the ironic position of asserting that Colonial itself conspired with Lexington's directors to defraud the present plaintiffs. Perhaps if Colonial is eventually successful on this claim and prevails against Lexington's directors, the directors will be able to seek contribution from the new plaintiff Colonial!
To summarize, I believe that although the plaintiffs have no viable derivative claims, their personal claims have merit sufficient to withstand the premature dismissal imposed by the trial court and affirmed by the majority.

III.
Corporate mergers should not extinguish rights that inure to shareholders as individuals apart from their status as corporation owners. Likewise, when, by virtue of merger, there exists no corporation from which shareholders' ownership rights derive, no derivative action should lie. The right to dissent from a merger proposal is personal, divorced from the ownership position, *858 and should be inexorably protected. Where a corporation's directors hide the truth from its owners, so that no objection will or can be made to an impending unalterable structural change, the right to dissent has been effectively denied.
The majority opinion seems to say that, without its holding, no remedy lies; clearly, that is not the case, as I have attempted to articulate in this opinion. Nor do the cases cited by the majority lend support for such a premise. Accordingly, with all due respect for my learned colleagues, I dissent.
NOTES
[1] If these plaintiffs, or any persons represented by these plaintiffs in the derivative claims, had not exchanged Lexington shares for Colonial shares but, rather, had had their shares repurchased by Colonial, the nexus, or umbilical cord, or, to use the term perhaps inartfully, "privity" between Colonial and the shareholders is absent to the extent that would be necessary to support a derivative claim. Cf. Rubinstein v. Catacosinos, 91 A.D.2d 445, 459 N.Y.S.2d 286 (1983) (merger completed after lawsuit filed, by way of stock repurchase, extinguished derivative claims brought on behalf of corporation merged out of existence).
[2] It appears from the record that Lexington had in effect an insurance policy that might have covered any losses occasioned by the allegedly fraudulent transactions. If this is so, the rights and remedies available under the policy would belong to Colonial even if the policy contained a "no assignments" clause. See Syracuse Lighting Co. v. Maryland Cas. Co., 226 N.Y. 25, 122 N.E. 723 (1919).
[3] "The right to vote is basic and fundamental to most shares of stock and is independent of any right that the corporate entity possesses and the shareholder could enforce and protect such rights by bringing a direct action." Reifsnyder v. Pittsburgh Outdoor Advertising Co., 405 Pa. 142, 149, 173 A.2d 319, 322 (1961) (footnotes omitted) (emphasis added).
[4] At this stage of the game, however, as the majority forthrightly states, injunction is not possible. Nevertheless, the merger could be voided and Lexington perhaps made whole via recovery from culpable directors.