598 So.2d 807 (1992)
Julian ELGIN, et al.
v.
ALFA CORPORATION, et al.
89-1227.
Supreme Court of Alabama.
April 17, 1992.
*809 Richard H. Gill, Robert D. Segall and Jim Vickrey of Copeland, Franco, Screws & Gill and Julian L. McPhillips, Jr. of McPhillips, DeBardelaben & Hawthorne, Montgomery, for appellants.
Robect A. Huffaker of Rushton, Stakely, Johnston & Garrett, Montgomery, for appellee Alfa Corp.
Robert W. Bradford, Jr. of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for appellees the Mutual Companies.
Thomas W. Thagard of Balch & Bingham, Montgomery, for appellees the Directors.

*810 ON APPLICATION FOR REHEARING
KENNEDY, Justice.
The opinion of August 30, 1991, is withdrawn and the following is substituted therefor.
This appeal involves a shareholder's derivative action filed on behalf of three mutual insurance companies, Alfa Mutual General Insurance Company ("Alfa General"), Alfa Mutual Insurance Company ("Alfa Mutual"), and Alfa Mutual Fire Insurance Company ("Alfa Fire") by Julian Elgin, Robert O'Connell, and Lloyd Taylor. The action named as defendants the three mutual insurance companies, Alfa Corporation, 18 directors of each of the mutual companies (the directors of each of the mutual companies being the same persons), and Goodwyn Myrick, who is president of each of the mutual companies and president and chairman of the board of directors of Alfa Corporation, a corporation formed by the three mutual companies to sell insurance. Attached as Appendix A to this opinion is a diagram of the Alfa corporate structure.
The plaintiffs sought relief on behalf of the mutual companies, because, they allege, the directors of the mutual companies improperly loaned and/or directly transferred cash and assets from the mutual companies to Alfa Corporation.
In an amended complaint, Lloyd Taylor withdrew as a plaintiff, and George F. LaMunyon and William C. Lawson were added as plaintiffs.
Two circuit court judges were involved with this case before this appeal. The first trial judge ordered a stay of discovery on the merits of the case until he could rule on whether the plaintiffs met the standing requirements of Rule 23.1, A.R.Civ.P. That judge later recused, without ruling on whether the plaintiffs had met those requirements. The second trial judge, addressing the defendants' motion to dismiss, entered the judgment appealed from in this case. The trial court stated that the issue before it on the motion to dismiss was "whether Plaintiffs have standing to bring and maintain this suit [o]n behalf of the mutual companies." It proceeded to hold, based on evidence from "depositions of numerous witnesses" and "a multitude of exhibits," that, except for the fact that Lawson, O'Connell, and LaMunyon were policyholders of Alfa Mutual, the plaintiffs were deficient in every Rule 23.1 requirement for standing, and the trial court dismissed the complaint with prejudice.
When a trial court, in considering a motion to dismiss, considers matters outside the pleadings, the motion to dismiss is treated as a motion for summary judgment. Rule 12(c), A.R.Civ.P.; Thorne v. Odom, 349 So.2d 1126 (Ala.1977). We have specifically held this to be true in a shareholder's derivative action. Green v. Bradley Construction Co., 431 So.2d 1226 (Ala. 1983). Accordingly, although the trial court worded its order in terms of dismissing the complaint, because it reached its determination by looking at matters outside the pleadings, such as the depositions and exhibits, we must review the judgment as a summary judgment. Rule 12(c), A.R.Civ.P.; Thorne; Green.
However, it is important to note that summary judgment was entered on the threshold matter of standing, rather than on the substantive merits of the plaintiffs' claim. Therefore, our discussion is limited to this context.[1]
The standard used to determine the propriety of a summary judgment is found in Rule 56(c), A.R.Civ.P. Stephens v. City of Montgomery, 575 So.2d 1095 (Ala. 1991). When the trial court found that the defendants had made a prima facie showing that there was no genuine issue of material fact and that they were entitled to a judgment on the standing issue as a matter of law, the burden of proof shifted to the plaintiffs to establish the existence of a genuine issue *811 of material fact and that summary judgment was, accordingly, improper under Rule 56(c).
To do this the plaintiffs had to rebut the defendants' prima facie showing by "substantial evidence." See Ala.Code 1975, § 12-21-12. In determining whether there is substantial evidence, we review the evidence in a light most favorable to the nonmovant (here, the plaintiffs) and resolve all reasonable doubts against the movant. Stephens, at 1097; Sanders v. Kirkland & Co., 510 So.2d 138 (Ala.1987). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
Finally, a trial court's entry of a summary judgment is a nondiscretionary ruling, and no presumption of correctness attaches to that ruling; accordingly, our review of the evidence properly presented in the record is de novo.[2]Hightower & Co. v. United States Fidelity & Guaranty Co., 527 So.2d 698 (Ala.1988).
Rule 23.1 provides:
"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."
Because in holding that the plaintiffs did not have standing, the trial court found that the plaintiffs were deficient in each of the foregoing requirements of Rule 23.1, we will examine each of these requirements as it relates to the facts of this case and the arguments of the parties.

The "Contemporaneous Ownership" Requirement of Rule 23.1
The requirement of Rule 23.1 that the plaintiff allege he was a "shareholder or member[3] at the time of the transaction of *812 which he complains" is referred to as a requirement of "contemporaneous ownership" or "substantive standing." Shelton v. Thompson, 544 So.2d 845 (Ala.1989). We have previously held that "contemporaneous ownership" also requires, in addition to being a policyholder at the time complained of, that the plaintiff be a policyholder at the time of filing the derivative suit. Green, at 1229.
It is undisputed that O'Connell, LaMunyon, and Lawson were policyholders of Alfa Mutual both when the complaint was filed and when the transactions complained of occurred. Accordingly, as to Alfa Mutual, those three plaintiffs met that requirement.
Elgin argues that he should be "equitably excused" from the Rule 23.1 contemporaneous-ownership requirement. The evidence indicates that Elgin was an Alfa Mutual policyholder at the time of the transactions complained of but that he was not at the time suit was filed. Alfa had, in the interim, "nonrenewed" his policies.
Because the derivative action has been historically and is to this day is an equitable action, Elgin's argument that he should be excused from the Rule 23.1 contemporaneous-ownership requirement merits scrutiny. See, Foss v. Harbottle, 2 Hare 461, 67 Eng.Rep. 189 (Ch. 1843); Dodge v. Woolsey, 59 U.S. (18 How.) 331, 15 L.Ed. 401 (1856); Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827 (1882); Tuscaloosa Manufacturing Co. v. Cox, 68 Ala. 71 (1880).
The record indicates that until January 1988, Elgin had been a member of the Montgomery County Farm Bureau, which allowed him to be a member of the Alabama Farmers Federation. Members of the Alabama Farmers Federation are eligible to apply for insurance coverage provided by the mutual companies. Elgin was an Alfa Mutual policyholder during the time of the events complained of.
On January 18, 1988, the Montgomery County Farm Bureau held a meeting and expelled Elgin from its membership. Then, as previously stated, Alfa Mutual "nonrenewed" his policies. The evidence indicates that Elgin's complaints about the transactions underlying this action were known to Alfa Mutual before the nonrenewal. Elgin's attorney had written Myrick a letter requesting information relating to the transactions involved. Also, Elgin had expressed to the Montgomery County Farm Bureau his reservations about the transactions made the basis of the complaint in this action. Finally, there was testimony from an Alfa Corporation executive to the effect that Elgin's complaints were a basis of his nonrenewal.
Elgin argues that, as a matter of equity, prospective derivative action defendants should not be allowed to preempt a derivative suit by divesting the complaining shareholder or policyholder involuntarily of the necessary status to bring the action, i.e., the status of "contemporaneous ownership." Elgin contends that he was nonrenewed for the sole purpose of depriving him of standing to bring this derivative action and that he should be, therefore, equitably excused from the "contemporaneous ownership" requirement that he be a policyholder at the time suit is filed.
The defendants assert that the nonrenewal was a "lawful exercise of a contractual right" and was in no way wrongful. They say further that this point has been decided adversely to Elgin in prior litigation and is thus barred from our consideration. The defendants assert the res judicata or collateral estoppel effect of Elgin v. Montgomery County Farm Bureau, 549 So.2d 486 (Ala.1989).
Elgin, the plaintiff in this case was also the plaintiff in Elgin v. Montgomery County Farm Bureau. In Elgin, Elgin had filed an action against the Montgomery County Farm Bureau and Alfa Mutual based on his "expulsion from membership in the Farm Bureau and the subsequent refusal by [Alfa Mutual] to renew insurance policies purchased by the plaintiff and his wife," 549 So.2d at 487, which we discussed above. Elgin alleged intentional interference with contractual relations and requested relief that would reinstate his policies with Alfa Mutual and his membership *813 in the Montgomery County Farm Bureau. Id. The trial court entered a summary judgment for the defendants on Elgin's claims, and we affirmed. We held that Elgin had not been deprived of due process of law by the Montgomery County Farm Bureau when it expelled him and that the trial court was correct in entering a summary judgment on his claim of intentional interference with a contractual relationship: Alfa had a contractual right to so act and Elgin had no contractual right to a renewal. 549 So.2d at 487-89.
The defendants argue that Elgin would have to show that he was wrongfully nonrenewed to advance his claim that he is to be equitably excused from contemporaneous ownership under Rule 23.1; they say that pursuant to our decision in Elgin v. Montgomery County Farm Bureau, he cannot now make that showing.
However, we note that Elgin v. Montgomery County Farm did not address an issue relating to the nonrenewal on a claim of equitable excusal from the Rule 23.1 requirement of contemporaneous ownership of an Alfa Mutual policy. We held in Elgin that Elgin had no personal cause of action forpersonal recovery or relief on his claims, and because the facts and law support that holding, we would so hold today. Nevertheless, that judgment does not address Elgin's request to be equitably excused from the derivative action's contemporaneous-ownership requirement so that he might maintain an action on behalf of the mutual companies, particularly Alfa Mutual. Thus, Elgin v. Montgomery County Farm Bureau has no res judicata or collateral estoppel effect as argued by the defendants.
Also, the question here is not whether the nonrenewal was wrongful so as to afford Elgin a personal cause of action against Alfa, but whether there was evidence presented from which one could reasonably infer that the nonrenewal was motivated by a desire to negate Elgin's standing to pursue a derivative action under Rule 23.1.
B.P. Richardson, the executive vice-president of operations for the mutual companies testified that Thaddeus Salmon, general counsel for Alfa Corporation, was involved in the decision to nonrenew Elgin. Richardson testified that Salmon had been under the mistaken impression that Elgin had previously been nonrenewed. According to Richardson, Salmon learned that Elgin was still a policyholder and directed that Elgin be "canceled" because of "[t]he antagonism and the opposition in several lawsuits and in this lawsuit." According to the evidence, "this lawsuit" had not been filed at that time.
We conclude that there was sufficient evidence that would preclude using Elgin's lack of policyholder status at the time of filing, i.e., contemporaneous ownership, as a basis for summarily dismissing him as a plaintiff.
It is of considerable import to this determination that Elgin presented evidence that he was a policyholder with Alfa Mutual at the time of the disputed transactions.
This Court promulgated Rule 23.1, then interpreted that Rule to require ownership of stock, or, in the case of mutual companies, ownership of a policy of insurance with a mutual company at the time of the filing of the complaint. See Green, at 1229. Yet, neither by our promulgation of the rule nor by our interpretation of it in Green did we intend, or did we in fact hold, that in a factual situation such as this there could be no equitable excuse.
Given the foregoing, we hold that Elgin was due to be equitably excused from the requirement that he be an Alfa Mutual policyholder at the time of the filing of the complaint in order to be a derivative plaintiff on Alfa Mutual's behalf.
Finally, relating to the derivative claim of the plaintiffs' on behalf of Alfa Fire and Alfa General, it is undisputed that none of the plaintiffs ever owned an Alfa Fire policy. Further, only LaMunyon had been a policyholder with Alfa General, but he was not a policyholder when the complaint was filed. See, Green, at 1229.
The plaintiffs argue that a "pooling agreement" entered into between the mutual companies and Alfa Corporation effectively *814 makes a policyholder in one mutual company a policyholder in all the mutual companies. However, this argument is insufficiently developed to merit our holding that by virtue of a plaintiff's ownership of an Alfa Mutual policy the plaintiff should be accorded policyholder status in Alfa Fire and Alfa General for Rule 23.1 purposes. Accordingly, none of the plaintiffs may properly maintain a derivative action on behalf of Alfa Fire or Alfa General. As to Alfa Fire and Alfa General, the trial court's judgment as to all the plaintiffs is due to be affirmed.

The "Director Demand" Requirement of Rule 23.1
Rule 23.1 requires that a derivative action plaintiff allege "with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors ... and the reasons for his failure to obtain the action or for not making the effort." That language is referred to as a provision for "director demand." One of the reasons for the director-demand requirement is that it allows the derivative corporation, on whose behalf the action is brought in the first place, to take over the litigation, thus permitting the directors the opportunity to act in their normal status as conductors of the corporation's affairs. See Shelton v. Thompson, 544 So.2d 845, 849 (Ala.1989). However, demand on the directors may be excused if that demand would be futile. Rule 23.1; American Life Insurance Co. v. Powell, 262 Ala. 560, 564, 80 So.2d 487, 490 (1954).
For example, in one of the earliest Alabama derivative action cases, this Court held that if the directors themselves are the alleged wrongdoers, then director demand may be futile. In Montgomery Traction Co. v. Harmon, 140 Ala. 505, 515, 37 So. 371, 373 (1904), this Court stated:
"It is well settled `that a stockholder may bring suit in equity in his own name, and enforce the rights of the corporation, without first requesting the directors to sue, when it is made to appear that if such request had been made it would have been refused, or, if granted, that the litigation following would necessarily be subject to the control of the persons opposed to its success; and that, where the directors of the corporation are themselves the wrongdoers or the partisans of the wrongdoer, they are incapacitated from acting as the members of the corporation in any litigation which may be instituted for the correction of the wrong which it is alleged they have committed and approved.' Steiner v. Parsons, 103 Ala. 221, 13 South. 774."
(Emphasis added.) Over time, this holding has evolved to dictate that director demand can be considered futile where a majority of the directors are alleged to be wrongdoers. See, e.g., Goldman v. Jameson, 290 Ala. 160, 275 So.2d 108 (1973); Henry v. Ide, 208 Ala. 33, 93 So. 860 (1922); Alabama Fidelity Mortgage & Bond Co. v. Dubberly, 198 Ala. 545, 73 So. 911 (1916); Ellis v. Vandergrift, 173 Ala. 142, 55 So. 781 (1911).
There are numerous federal cases generally consistent with this conclusion. For example, in Lewis v. Graves, 701 F.2d 245, 248-49 (2d Cir.1983), the United States Court of Appeals for the Second Circuit stated that "[d]emand is presumptively futile where the directors are antagonistic, adversely interested, or involved in the transactions attacked." See, also, Seidel v. Public Service Co. of New Hampshire, 616 F.Supp. 1342 (D.N.H.1985); Kamen v. Kemper Financial Services, Inc., 659 F.Supp. 1153 (N.D.Ill.1987); Brooks v. American Export Industries, Inc., 68 F.R.D. 506, 510 (S.D.N.Y.1975).
On this issue, the defendants say that in Shelton a plurality of this Court (quoting with approval Kaufman v. Kansas Gas & Electric Co., 634 F.Supp. 1573 (D.Kan. 1986)) stated that to show futility, the shareholder must demonstrate a degree of antagonism between the directors and the corporate interest to such an extent that the directors would be incapable of doing their duty. 544 So.2d at 851. Furthermore, the defendants argue that one United States Court of Appeals has held that a bare allegation that a majority of the directors are wrongdoers is insufficient, by itself, to establish the futility of a demand. *815 That court stated that "to excuse demand in these circumstances[a bare allegation of] majority of the board approval of an allegedly injurious corporate actwould lead to serious dilution of Rule 23.1." (Citation omitted.) In re Kaufman Mutual Fund Actions, 479 F.2d 257, 265 (1st Cir. 1973), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973).
We find the statements in Shelton and In re Kaufman to be consistent with our earlier case law. We adopt the plurality's statement in Shelton that to show futility the shareholder or policyholder must demonstrate such a degree of antagonism between the directors and the corporate interest that the directors would be incapable of performing their duty. We agree with In re Kaufman that a derivative action plaintiff should not be able to circumvent the Rule 23.1 director-demand requirement with a bare allegation that a majority of the directors are wrongdoers.[4] At the same time, our case law clearly indicates, and has so indicated for nearly a century, that where the majority of the directors are themselves the alleged wrongdoers, a derivative action plaintiff can be excused from director-demand because such a demand can be deemed futile. Therefore, in addressing a motion for summary judgment a court may consider evidence underlying the contention that a majority of the directors are wrongdoers against whom the action is based in support of the plaintiffs' argument of futility.
Here, in examining whether there was sufficient evidence that director demand was futile, thereby excusing it, we first examine the relationship of the mutual companies and Alfa Corporation.
The affidavit of B.P. Richardson, who holds the position of executive vice president of operations for all the mutual companies and also holds various positions as an officer with Alfa Corporation, describes that relationship:
"The board of directors of each of the Mutual Companies is composed of 18 persons. The directors of each of the three Mutual companies are the same. The board members are elected at the annual meeting of the policyholders and serve staggered three-year terms. Each of the boards of directors of the Mutual Companies elects their respective officers.
"The board of Alfa Corporation (`Alfa') is composed of eleven persons. Six of the directors serving on the Mutual Companies boards also serve as board members of Alfa. The stockholders of Alfa elect its directors who, in turn, elect the officers of Alfa."
The record further indicates that of the 11 members of the board of directors of Alfa Corporation, 6 of those members serve on the executive committee of each of the boards of directors of the mutual companies. Four of the six executive committee members of each of the boards are also Alfa Corporation executive officers. Three directors of Alfa Corporation and most of its executive officers hold the same positions with all three mutual companies.
The directors and executive officers of Alfa Fire and Alfa Mutual can control Alfa Corporation. A portion of the series of transactions that form the basis for the complaint in this action involves Alfa Corporation stock issuances and distributions of dividends. A prospectus filed with the Securities and Exchange Commission (SEC) by Alfa Corporation involving an Alfa Corporation stock issuance is included in the record. That prospectus states that Alfa Mutual owns 38.68% of Alfa Corporation's stock, Alfa Fire owns 10.78% of Alfa Corporation's stock, and the directors and officers own 4.3% of Alfa Corporation's stock; the prospectus further indicates that the mutual companies will buy sufficient stock in a "private placement transaction" to retain their respective percentage ownership of the corporation and that "[Alfa] Mutual and [Alfa] Fire control and can be expected to continue to control [Alfa Corporation] and its Board of Directors by virtue of their stock ownership and the stock ownership *816 of their directors and executive officers." In another place, under the heading "Control," the prospectus states, "As a result of their stock ownership and their shared management with [Alfa Corporation], [Alfa] Mutual and [Alfa] Fire can, as a practical matter, elect [Alfa Corporation's] Board of Directors and control the management and operations of [Alfa Corporation]."
It is not improper for the mutual companies' and Alfa Corporation's directors and executive officers to be interrelated in the manner described above or for Alfa Mutual and Alfa Fire, together with their directors and executive officers, to control Alfa Corporation. See Ala.Code 1975, §§ 27-29-1 et seq.
We state the foregoing and the following as background to the plaintiffs' arguments that they are entitled to be excused from director-demand on the basis of futility.
The transactions challenged involve a "pooling agreement" between the mutual companies and Alfa Corporation. The prospectus described the pooling agreement as an agreement between Alfa Mutual, Alfa Fire, Alfa General, and Alfa Corporation "pursuant to which premiums, losses, loss adjustment expenses, and other underwriting expenses attributable to the direct property and casualty insurance business of each party are pooled and reallocated among the parties." The prospectus states that Alfa Corporation, through the pooling agreement, has "substantially increased its property and casualty insurance business."
More than 40 years ago, the Alabama Farm Bureau formed the three mutual companies to provide low-cost insurance to its members. Later, in order to sell insurance in Georgia and Mississippi, the three mutual companies formed the initially small stock corporation, Alfa Corporation. Originally, Alfa Corporation constituted only about five percent of the aggregate insurance business of the entire enterprise; "it started just like a speck," defendant-director Luther Bishop said of Alfa Corporation.
"Under the pooling agreement, 50% of the pooled business is allocated to [Alfa Corporation]," the prospectus states. The prospectus specifically states that pursuant to the pooling agreement Alfa Mutual transferred 50% of its "pooled premiums, losses, loss adjustment expenses and other underwriting expenses" to Alfa Corporation. The prospectus is silent as to future transfers of insurance business to Alfa Corporation.
The prospectus also indicates that in August 1987 Alfa Corporation's property and casualty insurance subsidiaries borrowed $25 million from the mutual companies. The prospectus states that "the indebtedness is perpetual" and that the interest rate on that indebtedness is 7.6%.
Testimony indicated that each year Myrick, in consultation with B.P. Richardson, effectively nominates the candidates for the boards of directors of the mutual companies and of Alfa Corporation. Although the actual proposed slate of nominees is tendered by the sitting boards, defendant Milborn Chesser's testimony indicated that "management" made the nominations through recommendations to the sitting boards. Myrick testified that in the previous five years there had been no opposition to his "slates." Persons nominated are elected each year without opposition, almost unanimously. Defendants Chesser and Bishop, besides holding other positions related to the mutual companies and to Alfa Corporation, serve on the executive committees of the mutual companies and serve as directors of Alfa Corporation. Chesser and Luther Bishop testified that Richardson and Myrick were the "management" of the corporation, who actually make proposals for the directors to ratify. For example, Chesser testified that Richardson and Myrick made the proposal for the challenged "perpetual" loans to Alfa Corporation's subsidiary corporations.
Finally, the prospectus acknowledges that the mutual companies and Alfa Corporation may "have conflicting interests in their respective participation in the Pooling Agreement, and other conflicts of interest may also arise in their operations," and states, "Due to the amount of common stock ownership by Mutual and Fire and *817 Mutual's shared management with the Company, any such conflicts will be resolved otherwise than by arm's length negotiations." Further, the prospectus states, "in deciding matters in which the Mutual Group has an interest, the directors of [Alfa Corporation] will be governed by their fiduciary duties to the [corporation] and its shareholders, but no procedures have been established under which those matters would be resolved."
The plaintiffs argue that, from the evidence presented and the legitimate inferences to be drawn therefrom, they have sufficiently shown that director-demand would have been futile. They state that the record discloses that the directors of the mutual companies are transferring the assets of the mutual companies to Alfa Corporation and its wholly-owned subsidiaries; that their action is detrimental to the mutual companies; that the directors of the mutual companies are effectively determined by "key" individuals within the Alfa corporate complex, who can effectively determine who the directors of the mutual companies and Alfa Corporation will be and who, with their personal Alfa Corporation stock, plus their position with the mutual companies, can exercise absolute voting control of Alfa Corporation, to which the mutual companies' assets are allegedly being transferred. The plaintiffs assert that the entire situation is beneficial to all the directors of the mutual companies, who remain as directors by merely approving the transactions recommended to them.
We hold that there is legally sufficient evidence to support the plaintiffs' claim that director demand would be futile, and they are excused from the Rule 23.1 requirement of director-demand. The evidence permits the reasonable inference that director demand would have been futile.

Rule 23.1 and Shareholder Demand
In addition to requiring a demand on directors, Rule 23.1 states that if necessary the plaintiff must make a demand on the "shareholders or members" of the corporation.[5]
The defendants argue that American Life Insurance Co. v. Powell, 262 Ala. 560, 80 So.2d 487 (1954), requires, as an absolute prerequisite to maintaining a derivative action, that a policyholder make a demand upon other policyholders for redress of alleged corporate wrongdoing before the policyholder files the derivative action. We disagree.
Powell was decided long before the adoption of Rule 23.1 or any of the current rule provisions on pleading, and although we find it to be generally consistent with Rule 23.1 when its full text on shareholder demand is considered, Powell can be read more than one way in light of Rule 23.1. However, it is not pertinent to our review to address precisely how Powell is to be construed in light of Rule 23.1. It is evident that Powell is consistent with Rule 23.1 and that it does not stand for the proposition espoused by the defendants.
Powell indicates that there are Alabama cases in which shareholder demand was held to be not necessary; because Powell phrases its requirement of shareholder demand as "ordinarily necessary," it cannot be construed as the defendants argue.
Policyholder demand was not necessary in this case, because that demand was impractical. B.P. Richardson's affidavit indicated that there are over 373,000 policyholders in the mutual companies. Even one written formal demand by mail upon more than 373,000 mutual company policyholders would have been prohibitively expensive and time-consuming. Furthermore, the evidence does not indicate that there existed any other effective or reasonable method for soliciting action from the over 373,000 policyholders.
Federal cases have excused policyholder demand when the demand would have financially burdensome or unreasonable. For example, in Messinger v. United Canso Oil & Gas Ltd., 80 F.R.D. 730 (D.Conn. 1978), the court excused shareholder demand *818 when the plaintiff would have had to notify more than 11,800 shareholders. 80 F.R.D. at 738. Quoting Weiss v. Sunasco, Inc., 316 F.Supp. 1197, 1207 (E.D.Pa.1970), the Messinger court also noted the factor of the potential for redress, stating that "`it would be unreasonable to require resort to the shareholders as a condition precedent'" in situations where it was impractical because of "`the expense and effort necessary to bring the issues raised... before the shareholders of a publicly held corporation of this size' ... combined with the unlikelihood of replacing the current board or achieving some intra-corporate remedy." See Milstein v. Werner, 54 F.R.D. 228, 230 (S.D.N.Y.1972).
The defendants assert that the plaintiffs could have presented their complaints at an annual policyholders' meeting. However, the record indicates that "less than fifty" policyholders out of over 373,000 had attended the policyholders' meeting conducted around the time this lawsuit was filed.
Also, it is less than clear whether the policyholders at the policyholders' meeting would have possessed any direct voting authority to undo the transactions complained of if they sought to redress the plaintiffs' complaints. However, arguments made by both the plaintiffs and the defendants indicate that the policyholders had no such authority. The defendants emphasize for example, in discussing director-demand, that "[c]orporate authority emanates from the directors," and they cite Ala.Code 1975, § 10-2A-57, which states that absent some exception under the articles of incorporation or by statute, "all corporate powers shall be exercised by or under the authority of, and the business affairs of the corporation shall be managed under the direction of, a board of directors." (Emphasis added.) Based on the arguments of the parties and absent any evidence to the contrary, we assume arguendo that the policyholders did not possess the requisite authority to undo the business transactions complained of.
We find the defendants' arguments that a demand on the policyholders should have been made at the annual meeting unpersuasive; based on what is before us, we cannot conclude that the policyholders' meeting would have presented the plaintiffs with a forum to undo the transactions complained of or one in which they could have reached any significant number of policyholders.
We hold that the record sufficiently supports a determination that policyholder demand was not necessary because that demand was impractical.

The Rule 23.1 Requirement of Fair and Adequate Representation
Rule 23.1 provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." (Emphasis added.)
This Court has not established specific criteria or guidelines for determining whether a derivative-action plaintiff fairly and adequately represents similarly situated shareholders, or, in this case, policyholders. Because the defendants, citing several cases, deny that the plaintiffs are fair and adequate representatives, we address and accept the following guidelines to aid in determining whether a derivative-action plaintiff fairly and adequately represents similarly situated shareholders or policyholders. We do not elevate any single factor as most important or as necessarily determinative of the outcome; the ultimate inquiry is whether the policyholder fairly and adequately represents similarly situated policyholders.
In Davis v. Comed, Inc., a case concerning fair and adequate representation, the court wrote:
"The courts have examined several factors or elements in determining whether a particular derivative plaintiff can provide the requisite fair and adequate representation. Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1 (although often a *819 strong showing of one way in which the plaintiff's interests are actually inimical to those he is supposed to represent fairly and adequately, will suffice in reaching such a conclusion). Among the elements which the courts have evaluated in considering whether the derivative plaintiff meets Rule 23.1's representation requirements are: economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent."
619 F.2d 588, 593-94 (6th Cir.1980) (Emphasis added.)
Although the Sixth Circuit Court of Appeals cited no authority for this list of factors, we are convinced from our review of federal case law and other authorities that Alabama courts may properly consider the above factors, as well as the factors that follow, in determining whether a derivative-action plaintiff fairly and adequately represents similarly situated shareholders.
In Rothenberg v. Security Management Co., the Eleventh Circuit Court of Appeals stated:
"Whether a particular plaintiff will fairly and adequately represent the interests of other similarly situated shareholders as required by Rule 23.1 turns upon the total facts and circumstances of each case. Some of the factors considered by courts include: (1) indications that the plaintiff is not the true party in interest; (2) the plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit; (3) the degree of control exercised by the attorneys over the litigation; (4) the degree of support received by the plaintiff from other shareholders; (5) the lack of any personal commitment to the action on the part of the representative plaintiff." 667 F.2d 958, 961 (11th Cir.1982). (Citations omitted.) See Larson v. Dumke, 900 F.2d 1363 (9th Cir.1990) (which accepts the considerations given by Davis v. Comed and Rothenberg). In Davis v. Comed the court refined the larger question the factors we have discussed are directed to, whether the representation is "fair and adequate":
"The decisions have interpreted this to mean that a court should examine any indications that there are extrinsic factors which `render it likely that the representative may disregard the interests of the class members.' Indeed, `while a plaintiff is not necessarily disabled to bring suit simply because some of his interests extend beyond that of the class, the court may take into account outside entanglements that render it likely that the representatives may disregard the interests of the other class members.' Blum v. Morgan Guaranty Trust Co. of New York, 539 F.2d 1388, 1390 (5th Cir. 1976). See also Hornreich v. Plant Industries, Inc., 535 F.2d 550, 552 (9th Cir. 1976)."
Davis v. Comed, at 593.
Similarly, the United States Court of Appeals for the First Circuit, in G.A. Enterprises, Inc. v. Leisure Living Communities, Inc., 517 F.2d 24, 27 (1st Cir.1975), stated:
"A plaintiff is not disqualified under Rule 23.1 merely because of the existence of interests beyond those of the class he seeks to represent so long as he shares a common interest in the subject matter of the suit. And purely hypothetical, potential or remote conflicts of interest do not disable him.... Thus, it is sometimes said that the antagonism of interests `must go to the subject matter of the suit'meaning that antagonism irrelevant to the proceeding may be disregarded...."
We now turn to a discussion of the arguments and facts that relate to this issue.
The defendants argue that Elgin brought this action to discredit the current *820 management of the mutual companies and Alfa Corporation, because, they say, he has had and continues to have a personal plan either to drive the defendants out of business or to take them over and reunify the Alabama Farmers Federation with the American Farm Bureau Federation.
The defendants state that Elgin began to attack them, or to plan to, sometime after 1978, when, according to the defendants, Elgin thought that the election of the current officers and directors of the Alabama Farm Bureau was procured by fraud. In 1980, the Alabama Farm Bureau withdrew from the American Farm Bureau, and, the defendants say, Elgin filed an action against the Alabama Farm Bureau Federation, two of the mutual companies, a life insurance subsidiary of Alfa Corporation, and certain directors and officers, seeking recovery under various theories of tort and contract law, as well as injunctive relief to force reaffiliation with the American Farm Bureau Federation. That suit was dismissed, and this Court affirmed the dismissal. Elgin v. Alabama Farm Bureau Federation, 431 So.2d 1151 (Ala.1983).
Elgin stated in deposition that he believes that the election of the current officers was procured by fraud. Elgin also stated that he hopes that one of the results of this lawsuit would be a reunification of the Alabama and American Farm Bureaus. We will discuss the two lawsuits in applying the evidence to the Rothenberg, Davis v. Comed, and G.A. Enterprises, Inc. considerations.
The defendants argue that Elgin continued in his discontent and say that by 1988 he was such an intolerable presence that his membership in the Montgomery County Farm Bureau was terminated. We have already discussed that incident and Elgin's subsequent litigation, Elgin v. Montgomery County Farm Bureau, when we discussed Elgin's argument for equitable excusal from the contemporaneous ownership requirement of Rule 23.1. The defendants point out that although that action is no longer pending, it was pending when Elgin filed this action.
The defendants also state that Elgin continued his plan to discredit the directors and either to destroy or to take over the mutual companies by creating a new corporation. It is not disputed that Elgin had a flier printed that stated:
"A message from Julian Elgin (Member of Alabama Farm Bureau Board of Directors 1949-1960)Join with me in a Farm Charter CommitteePurpose (1) To affiliate with AFBF [American Farm Bureau Federation]*. (2) make AFBF insurance and services available to all Alabama families*will meet with AFBF in San Antonio, Tx on January 8, 1989 to seek affiliation."
The record supports the reasonable inference, however, that Elgin did not desire to use the Farm Charter Committee to compete with the mutual companies or to damage the mutual companies' insurance business. Instead, as the testimony below indicates, Elgin was interested in creating a group to succeed the mutual companies' directors, who he hoped would ultimately be removed from their positions by this derivative action:
"Q. So, let me make sure I understand this ... you wouldOnce you established an affiliate of the American Farm Bureau Federation here in Alabama you would expect those members to be able to avail themselves of insurance through insurance companies associated with the American Farm Bureau Federation such as Southern Farm Bureau Insurance and perhaps others?
"A. We would haveNow, my assuming this is assuming I will prevail in this action in this case, that something will have to be done because you are not going to have any officers on the thing anymore after that. You are not going to have the members of the board on here. You got to have a new board and new directors for the board that is shown here now, and if we win this suit, somebody will have to step in, and that is what I wanted to create here: A nucleus of people over the state who would be eligible and interested in taking over the organization *821 that is called now the Alfa Mutual Insurance Companies that succeeded the Farm Bureau Federation Casualty and Farm Bureau Fire. They succeeded in name. If you get enough people, membership that would be interested to join this"
Elgin testified that if he lost this derivative action, he would like to start a new insurance company affiliated with the American Farm Bureau.
Elgin, as the defendants state, met with the presidents of several southern Farm Bureaus in Jackson, Mississippi, in October 1988. Elgin testified that he asked them for $50,000 to support the Farm Charter Committee and that he also told them about the derivative action. However, Elgin also testified that he did not ask them, and has not asked anyone, to help finance this lawsuit.
The record indicates that Elgin was unable to meet the organizational requirements to affiliate the Farm Charter Committee with the American Farm Bureau before its San Antonio meeting and has since stopped his efforts to organize the Farm Charter Committee.
The defendants also state that Elgin does not know enough about the incidents involved in this suit to be a plaintiff.
Elgin testified that his knowledge came primarily from two sources: an Alfa Corporation stock prospectus filed with the SEC and "the Raburn Report." The Raburn Report is a document prepared by the Birmingham accounting firm of H.C. Raburn & Company in connection with the plaintiff's prefiling deliberations. According to testimony, the Raburn Report discussed the transactions made the basis of this action.
Elgin has specifically complained of (1) the "perpetual loan" from the mutual companies to Alfa Corporation, (2) contractual arrangements that he alleges force the mutual companies to buy stock in Alfa Corporation and thereby prop up the value of that stock, (3) the mutual companies' supposed unencumbered surplus of over $200 million, that is, according to Elgin, being transferred to Alfa Corporation, and (4) the alleged transfer of the mutual companies' agency personnel and buildings to Alfa Corporation. When questioned, Elgin did not know that Alfa Mutual was Alfa Corporation's largest shareholder, and on one occasion, in 900 pages of deposition testimony, he indicated that the mutual companies were subsidiaries of the stock company. In the remainder of his testimony, he indicated that he knew they were not subsidiaries.
Finally, the defendants state that Elgin's interests are not toward the well-being of the mutual companies, because, they say, he realized that this lawsuit might result in the reduction of the value of the stock of Alfa Corporation of which Alfa Mutual is the largest shareholder, but did not care if the lawsuit did cause such a reduction.
Elgin, however, testified that he "did not think it could" affect the stock value, considering that, as he understands, the mutual companies are contractually obligated to take various actions that he believes will prop up the value of Alfa Corporation stock regardless. He testified that it was of "no concern" to him if the lawsuit did affect Alfa Corporation stock value, because he was primarily "concerned with the effect on the mutual companies." We note that Elgin repeatedly testified in a vein similar to the following: "I'm representing the policyholders of the mutual companies. That's what this case is about, because I'm trying to represent their interest and be a plaintiff on their behalf."
Simply stated, defendants equate Elgin's desire to replace the directors with a desire to destroy or harm the mutual companies. We cannot conclude that Elgin's desire to "make a clean sweep" of the directors is a disqualifying antagonism when, as the record indicates, the reason Elgin wants to eliminate the directors is that he believes that they are harming the mutual companies on whose behalf he brings this action.[6]
*822 We must also disagree with the defendants' arguments that Elgin's interests in this action are antagonistic to those of the mutual companies he wants to represent, because of his "vindictiveness" toward the defendants, shown, the defendants say, by the nature of his actions in other litigation he has filed against the defendants, and, they say, because of his desire for personal economic gain. See Davis v. Comed, at 593-94.
The two other lawsuits that Elgin filed do not indicate disqualifying antagonisms. Both have been completed without Elgin prevailing, see Rothenberg at 960-61, so the derivative action will not be compromised or used to achieve a settlement or gain in them. See G.A. Enterprises. Furthermore, the substance of the lawsuits does not indicate that Elgin wants to harm the mutual companies or that he has an antagonistic interest to them in relation to this derivative action.
As to the defendants' argument that Elgin seeks personal gain that is antagonistic to the interest of the mutual companies, this argument is largely the argument described earlier about Elgin's plan to destroy or take over the mutual companies. None of the relief sought in the complaint will benefit Elgin personally, except to the extent that he is a shareholder of the mutual companies. See Davis v. Comed.
There is insufficient support for the defendants' argument that Elgin has personal interests actually antagonistic to those of the mutual companies.
The defendants also argue that Elgin is too unfamiliar with the litigation to be a fair and adequate representative. See, Rothenberg.
The evidence we have described indicates that Elgin is sufficiently aware of the basis and proceedings in this litigation to fairly and adequately serve as a representative.
In summary, we hold, as to Elgin, that there is legally sufficient evidence that he can fairly and adequately represent similarly situated policyholders.[7]
The defendants' also argue that the remaining plaintiffs are not fair and adequate representatives.
The defendants state that plaintiff George LaMunyon was a "straw man" for Elgin, whose only knowledge of the litigation, they say, comes from Elgin and the plaintiffs' lawyers. Under Rothenberg, evidence that the party is not the true party in interest, as well as evidence of the plaintiff's unfamiliarity with the litigation and unwillingness to learn about it, may indicate that the plaintiff does not fairly and adequately represent similarly situated shareholders. 667 F.2d at 961.
LaMunyon testified as if he knew virtually nothing about the subject matter of the complaint or of the derivative action. His knowledge of the complaint came from the news media. Although he had made the decision to be a plaintiff nearly a week before the deposition, he did not see the complaint until the day of his deposition, and he had not read it even then. While LaMunyon may have been willing to learn more about the subject matter of the action, see Rothenberg, at 961-62, we agree with the defendants that his near-total unfamiliarity *823 with the subject matter of the derivative action renders him unable to adequately represent similarly situated shareholders. Id. Accordingly, as to LaMunyon, the trial court did not err in determining that he could not maintain the derivative action on behalf of any of the mutual companies. In making this decision we do not suggest that a representative plaintiff must have a precise understanding of every fact or legal issue in a derivative suit. See id. at 963.
Also, citing Rothenberg and Davis v. Comed, the defendants argue that Robert O'Connell is another "straw man" for Elgin and that Elgin "lured" O'Connell into this suit by using a mutual friend who was a lawyer and who had separately represented both of them in lawsuits. They also contend that O'Connell is primarily motivated by hope for personal gain; that is, that he wants to obtain dividends if Alfa Corporation is forced to return assets to the mutual companies. Finally, they contend that O'Connell cannot be a properly representative derivative plaintiff, because, they say:
"He was not familiar with the organizational structure of the Mutual Companies or the types of insurance written by them. O'Connell did not know whether the Mutual Companies had sustained losses or made profits in the last five years, the nature of the relationship between Alfa Corporation and the Mutual Companies, or if the three Mutual Companies owned stock in Alfa Corporation."
The record indicates that O'Connell was a friend of, and had been represented by, Earl Dansby, who represented Elgin in Elgin v. Montgomery County Farm Bureau. However, O'Connell testified that Elgin had never talked to, or contacted, him until after this action was filed and that he did not know Dansby represented Elgin. The record indicates that O'Connell and Elgin met for the first time on the day of O'Connell's deposition.
The evidence indicates the following: Dansby was the first person to mention this action to O'Connell; Dansby told O'Connell about a purported $200 million surplus that the Mutual Companies were transferring to Alfa Corporation. O'Connell then contacted Richard Gill, one of the plaintiffs' attorneys. O'Connell read both Alfa Corporation's SEC prospectus and the Raburn Report. O'Connell allowed the lawyers to decide what transactions described in those documents to make the basis of the complaint, which he says he "carefully" read. After considering the complaint for a week, he decided to sign it. Although O'Connell testified that he "didn't understand a lot of [the complaint]," he also testified that he was bringing the action to benefit the mutual companies because of an alleged "$200 million discrepancy" and because of the "perpetual" loan made at, he says, a favorable interest rate, two of the major transactions challenged in this derivative action.
Our review of the evidence indicates that O'Connell was not a "straw man" for Elgin. There is evidence that O'Connell had no contact with Elgin until after O'Connell became a plaintiff. Furthermore, there is evidence that O'Connell decided to join the action only after reading Alfa Corporation's SEC prospectus and the Raburn Report and then reading the complaint and considering it for a week.
The defendants argue that O'Connell had insufficient knowledge about the lawsuit to be a properly representative derivative plaintiff, because, they say, he was not familiar with the organizational structure of the mutual companies, the type of insurance the mutual companies sold, whether the mutual companies were profitable the last five years, and the nature of the relationship between Alfa Corporation and the mutual companies, particularly whether the mutual companies were shareholders in Alfa Corporation.
O'Connell did not know the answer to any of these inquiries. However, none of those matters forms the actual basis for the matters complained of in this action. The allegedly improper transfer of assets from the mutual companies to Alfa Corporation could have occurred regardless of any of those facts. We may speculate that if O'Connell had known the exact organizational *824 relationship between Alfa Corporation and the mutual companies, he might have decided that the allegedly improper transactions were less detrimental to the mutual companies than he believed because the mutual companies were shareholders in Alfa Corporation. Certainly, this is a matter that the defendants may examine with regard to O'Connell's allegations on the merits of the case. However, this evidence is far short of fatally countering evidence that O'Connell did know enough about the subject matter of the action and of the complaint to fairly and adequately represent similarly situated policyholders.
As to O'Connell's personal economic motivations, he testified, "I am not looking for anything out of this." He also testified several times that he would like to see the mutual companies' assets returned to them and that if the assets were returned, he hoped and believed that this would result in a decrease of insurance rates or a dividend to the mutual companies' policyholders. The policyholders are the beneficial owners of the mutual companies, according to the affidavit of the mutual companies' B.P. Richardson.
O'Connell has no other lawsuits or claims against the mutual companies, and the evidence that we have described indicates that any economic gain he expects to receive from the suit would be a shared gain with all other mutual company policyholders. The defendants argue summarily that O'Connell wants to force a payment of dividends regardless of what effect it would have on the mutual companies, but O'Connell and the complaint address unencumbered surplus.
As to the plaintiff William Lawson, the defendants argue that he is also Elgin's "straw man," but their basis for that claim is unclear.
Lawson is a former examiner for the Alabama Department of Insurance. The defendants argue that Lawson is interested in helping only himself with the lawsuit, not the mutual companies, and that his personal goals are (1) to expose wrongdoing in the Alabama Insurance Department and (2) to obtain dividends for himself and the other mutual company policyholders. The defendants also argue that Lawson should be disqualified as a representative because, they say, he had a hail-damage claim dispute with Alfa Mutual and was contemplating litigation at the time of his deposition; that Lawson should be disqualified as a derivative plaintiff because he never reported any alleged wrongdoing by Alfa concerning the actions involved in this lawsuit while he was a Department of Insurance examiner; and that he should be disqualified as a representative because he said he would not pay any costs for this litigation, even if ordered to by a court.
The record indicates that Lawson became a plaintiff after learning of the lawsuit from newspaper stories and that he did not know Elgin, LaMunyon, or O'Connell before the lawsuit was filed. Based on the evidence and arguments before us, we cannot conclude that he was a "straw man."
As to the defendants' complaint that Lawson wants to expose wrongdoing in the Alabama Department of Insurance with this action, the record indicates that Lawson did say he wanted to do that. However, a plaintiff is not disqualified "merely because of the existence of interests beyond those of the class he seeks to represent, so long as he shares a common interest in the subject matter of the suit." G.A. Enterprises, at 27.
The defendants' complaint that Lawson seeks to obtain dividends is the same as the argument asserted against O'Connell that we have rejected.
Lawson does have a hail-damage dispute with Alfa Mutual and was considering litigation on that claim at the time of his deposition. The record, however, does not indicate, nor do the defendants argue, that Lawson ever filed a lawsuit.[8] Also, the record does not otherwise indicate that he is vindictive toward the mutual companies or even toward Alfa Corporation; indeed, he stated that he recommends Alfa insurance *825 to people with whom he talks about insurance.
The defendants' argument that Lawson did not report any wrongdoing in the transactions he complains of as a plaintiff in this case is an argument properly addressed to the merits of the case, not to the propriety of Lawson's being a representative under Rule 23.1.
The defendants do raise, however, a legitimate concern about Lawson's representative capacity in relation to his testimony that he would not pay any of the costs of litigation, even if ordered to do so by a court. Such testimony raises questions concerning "the lack of any personal commitment to the action on the part of the representative plaintiff." Rothenberg, at 961.
In this regard, we have scrutinized Lawson's lengthy deposition testimony and conclude that Lawson does not lack "personal commitment to the action." Id. Except for Lawson's statement that he would not help pay the costs of the lawsuit, his testimony indicates that he is genuinely and unequivocally committed to it.
As to Lawson's specific knowledge of the transactions made the basis of this lawsuit, we note testimony to the effect that Lawson has examined State insurance records concerning those transactions, he is familiar with the mutual companies because he examined them while working at the Department of Insurance, and that he read the complaint, and took it home and studied it, before he decided to become a plaintiff.
Based on the foregoing, we conclude that the trial court erred when it determined that Lawson did not fairly and adequately represent similarly situated shareholders of Alfa Mutual.
In summary, we hold that Elgin, O'Connell, and Lawson are proper derivative plaintiffs for Alfa Mutual, and as to those plaintiffs for that company, the judgment is due to be reversed and the cause remanded. O'Connell and Lawson showed "contemporaneous ownership" and Elgin is equitably excused from the requirement of policyholder status at the time of filing. Elgin, therefore, also meets the requirement of contemporaneous ownership. All three were excused from a director-demand on the futility doctrine, a policyholder demand was unnecessary as impractical, and they are "fairly and adequately" representative of the policyholders. Elgin, O'Connell, and Lawson are not proper derivative plaintiffs for Alfa Fire or Alfa General. LaMunyon is not a proper derivative plaintiff for any of the mutual companies. As to Alfa Fire and Alfa General the judgment is affirmed to all the plaintiffs and as to Alfa Mutual, the judgment is affirmed as to LaMunyon.
Finally, the defendants have filed with this court a request for a prehearing conference pursuant to A.R.App.P. 33, for the purpose of discussing actions, which, they say, have been taken pending this appeal. Specifically, the defendants state that they created a disinterested committee to investigate the plaintiffs' complaints and to offer conclusions as to whether this lawsuit was in the best interest of the mutual companies. They state that consistent with that committee's findings and conclusions and with Roberts v. Alabama Power Co., 404 So.2d 629 (Ala.1981), this lawsuit must be terminated. They have also requested a protective order regarding the committee's report, which they say contains information "which if disclosed might have a detrimental effect on their businesses or give competitors of the mutual companies a competitive advantage."
These matters are properly addressed in the trial court; in addition to remanding this case based on our holdings stated above, we also transfer to the trial court the matter of a protective order and the question whether the defendants have taken action that would require termination of this lawsuit under prevailing law.
APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
SHORES, ADAMS and INGRAM, JJ., concur.
*826 HORNSBY, C.J., concurs in the result.
HOUSTON, J., concurs in part and dissents in part.
STEAGALL, J., dissents.
HOUSTON, Justice (concurring in part and dissenting in part).
This is certainly a better reasoned and a better written opinion than the opinion released on August 30, 1991. However, I readopt my "concurring in part and dissenting in part opinion."
I concur in part and dissent in part. Using our standard of review and applying the law to the facts considered in a light most favorable to the plaintiffs, the nonmovants, I am of the opinion that the trial court did not err in dismissing this action insofar as these plaintiffs are concerned.
In my opinion, the majority's finding that Mr. Elgin is equitably excused from being a policyholder of Alfa Mutual is wrong and contrary to the holdings in Ex parte Blue Cross & Blue Shield of Alabama, 582 So.2d 469 (Ala.1991); 1 Newburg on Class Actions, p. 190 (1977); General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).
The section of the majority opinion styled "Rule 23.1 and shareholder demand" is incomprehensible to me; or, if I do comprehend it, it is wrong. In my opinion, that portion of the trial court's order styled "Demand on Policyholders" is legally correct and factually supported, even considering the facts in the light most favorable to the plaintiffs.
The brevity of my dissent, which is unusual in and of itself, is not that I in any way make light of the excellent briefs or the challenging oral arguments of the attorneys for the parties, but due only to the fact that after having read and reread the briefs, having reviewed my notes taken during oral arguments, and having given this case much deep thought, I believe that the trial court correctly decided this matter. The trial court's action in no way would preclude other policyholders, who would fairly and adequately represent the policyholders of any of the mutual companies, or other stockholders who would fairly and adequately represent the shareholders of the corporations from pursuing this matter by complying with Rule 23.1, A.R.Civ.P. Burdeshaw v. White, 585 So.2d 842 (Ala.1991).
*827 
NOTES
[1] We speculate that the trial court, in dismissing the plaintiff's complaint with prejudice, without giving the plaintiffs notice of its intentions or an opportunity to amend, see A.R.Civ.P. 15(a), (d); 23.1, meant to enter a judgment on all of the plaintiffs' claims, rather than on the standing issue alone. However, what is before us is an entry of a summary judgment on the standing issue alone.
[2] We note that in Green we examined a summary judgment on a Rule 23.1 standing issue and applied our traditional summary judgment review. Although we did not specifically refer to the term "de novo," we stated, for example, that "we must view the record before us in the light most favorable to the party opposing the motion for summary judgment." Green, at 1228. Green was decided after Roberts v. Alabama Power Co., 404 So.2d 629, 636 (Ala.1981). Roberts indicated that a trial court's summary judgment on a "fair and adequate representation" standing issue under Rule 23.1 was largely within the discretion of the court. We presume that Roberts accorded discretion on the "fair and adequate" representation issue because the testimony in Roberts was ore tenus, although Roberts is unclear in this respect. See Moore v. Williams, 519 So.2d 1337 (Ala.1988) (stating the "abuse of discretion" standard used in reviewing a judgment based on ore tenus testimony); Ala. Code 1974, § 12-2-7(1) (stating that "no weight shall be given the decision of a trial judge upon the facts where the evidence is not taken orally before the judge"). We note that the present case, like Green, does not involve ore tenus testimony.
[3] The plaintiffs bring the action allegedly as policyholders in the mutual companies. Mutual companies do not have "shareholders" in the way a corporation, such as Alfa Corporation, has shareholders. It is undisputed that a policyholder in a mutual company can bring a derivative action on behalf of the mutual company. See 43 Am.Jur.2d, Insurance § 74 (1982) at 155; Pomerantz v. Clark, 101 F.Supp. 341 (D.Mass. 1951).
[4] We note that Rule 23.1 itself provides that such matters must be pleaded with particularity, although this is not an issue that is before us, because this case was decided not on the pleadings but is being treated as a summary judgment.
[5] Also, a plaintiff may be "excused" from such a demand if the plaintiff shows sufficient justification. We have not previously established what will suffice to excuse policyholder demand and do not do so here. We address this issue in terms of whether demand was "necessary."
[6] The evidence indicates that Elgin hopes that one of the results of the derivative action will be the reunification of the Alabama Farm Bureau with the American Farm Bureau Federation. This does not disqualify him, however, because "a plaintiff is not disqualified under Rule 23.1 merely because of the existence of interests beyond those of the class he seeks to represent, so long as he shares a common interest in the subject matter of the suit." G.A. Enterprises, at 27.
[7] The defendants also argue that because Elgin went to government authorities before bringing this action and those authorities have not taken action on Elgin's complaints, which serve in part as the substantive basis for this derivative action, the order of the trial court is due to be affirmed. That argument addresses the merits of the case, which are not before us.

The defendants further argue that Elgin lacked the support from other policyholders necessary to sustain this action. Rothenberg. We disagree. Lack of support from other policyholders is usually considered to be a factor when only one plaintiff is bringing the action, see, e.g., Larson v. Dumke. In this situation, with publicity about the lawsuit, three other plaintiffs joined Elgin. Additionally, there was evidence that, rightly or wrongly, some plaintiffs were afraid to join because of the possibility of reprisals by the defendants, for example, "nonrenewals" of policies.
[8] It would be a matter of serious concern if such a lawsuit were ongoing or if Lawson were a judgment creditor because of such an action. See Rothenberg.